Maine Yankee v. Bonsey, et al.      CV-00-113-M   05/04/00  P
                    UNITED STATES DISTRICT COURT

                         DISTRICT OF MAINE


Maine Yankee Atomic
Power Company,
      Plaintiffs

      v.                              Civil No. 99-279-P-C (ME)
                                      Civil No. 00-113-M    (NH)
Osmond C. Bonsey, Chair of            Opinion No. 2000 DNH 106
the Board of Environmental
Protection and Martha Kirkpatrick,
Commissioner, Maine Department of
Environmental Protection,
      Defendants


                        **O R D E R**


      Plaintiff Maine Yankee Atomic Power Company ("Maine Yankee")

brought this suit to challenge the jurisdiction asserted by the

State of Maine's Board of Environmental Protection ("BEP" or "the

Board") and Department of Environmental Protection ("DEP" or "the

Department") over Maine Yankee's planned transfer of spent

nuclear power plant fuel from one on-site storage facility to

another.  The planned new storage system is referred to in the

nuclear regulatory field as an "independent spent fuel storage

installation" or "ISFSI".  Maine Yankee seeks (1) a declaratory

judgment – holding that the regulation of nuclear fuel storage is a field entirely preempted by federal law; and (2) an injunction precluding defendants from requiring, issuing or enforcing any state permit or license related to Maine Yankee's ISFSI under Maine's Site Location of Development Act ("Site Law"), Me. Rev. Stat. Ann. tit. 38, §§ 481-490 (West 1989 & Supp. 1999). Before the court are defendants' motion to dismiss, plaintiff's motion for partial summary judgment, and Friends of the Coast – Opposing Nuclear Pollution's ("Friends of the Coast") motion to intervene, as well as its answer, counterclaims, and motion to dismiss.

## Background

Maine Yankee owns, and until recently operated, a commercial nuclear power plant in Wiscasset, Maine. It operated the plant under an Atomic Energy Commission ("AEC") licence issued pursuant to 42 U.S.C. § 2134(b) and 10 C.F.R. Part 50 (a "Part 50 operating license" or "operating licence"). The Wiscasset facility's nuclear reactor was shut down on December 6, 1996, and eight months later Maine Yankee's board of directors voted to

2

permanently cease operation of the plant. After filing required certifications, see 10 C.F.R. § 50.82(a)(i) and (ii), with the Nuclear Regulatory Commission ("NRC") (the AEC's successor), Maine Yankee began the process of decommissioning the nuclear plant. Decommissioning is proceeding under Maine Yankee's Part 50 operating license. See 10 C.F.R. § 50.51(b).

In decommissioning the nuclear facility, Maine Yankee is required by its operating license to ensure the "storage, control and maintenance of the spent fuel, in a safe condition." 10 C.F.R. § 50.51(b)(1). It expects to comply with that obligation by transferring its spent radioactive fuel, currently held in a water-filled "spent fuel pool" inside the plant, to an ISFSI employing a dry cask storage system. The storage system Maine Yankee proposes to use - the Universal Multi-Purpose Canister System ("UMS™") - is subject to NRC approval, and is currently being reviewed. As part of that review, NAC International, Inc., the developer of UMS™, has submitted a Safety Analysis Report ("SAR") on the system for the NRC's consideration.

Maine's Site Law requires approval by the Department before construction or operation of "any development of state or regional significance that may substantially affect the environment."  Me. Rev. Stat. Ann. tit. 38, § 483-A (West Supp. 1999).  Because the Site Law did not become effective until after construction of Maine Yankee's plant was substantially underway, no state development permit was ever requested or issued.  When minor alterations to the facility were made in 1992, however, Maine Yankee sought and obtained a Site Law permit, but expressly reserved its right to later contest application of the state's Site Law on federal preemption grounds.

On May 4, 1999, Maine Yankee applied for an amended permit under the Site Law and Maine's Natural Resources Protection Act ("NRPA")[1] in connection with the proposed ISFSI.  On August 19, 1999, the DEP recommended that the Board assume jurisdiction over Maine Yankee's application, pursuant to Me. Rev. Stat. Ann. tit.

---

[1]The NRPA, codified at Me. Rev. Stat. Ann. tit. 38, §§ 480-A to Z (West 1989 & Supp. 1999), requires prior approval from the Department to engage in certain activities in or adjacent to protected natural resources such as wetlands.

38, § 341-D(2)(West Supp. 1999), which authorizes the Board to assume jurisdiction over an application that has "generated substantial public interest."  On August 19, 1999, the Board accepted the DEP's recommendation and voted, over Maine Yankee's objection, to assume jurisdiction.  The Board issued a procedural order on October 7, 1999, requiring Maine Yankee to provide copies of its Site Law application and the Safety Analysis Report it filed with the NRC to intervenors in the state proceeding[2] by October 13, 1999.  On September 15, 1999, Maine Yankee filed this suit challenging the state's authority to regulate any aspect of its decommissioning activities.

Friends of the Coast is a non-profit organization incorporated in the State of Maine.  Its purpose is "to advocate and educate with respect to the organization's goal of ending the risk of nuclear accidents and nuclear pollution in Maine, and in particular in relation to [Maine Yankee's] facility in Wiscasset."  (Aff. of Raymond Shadis at ¶ 2.)  As noted

_____

[2]The Board had granted petitions to intervene filed by the Town of Wiscasset and Friends of the Coast.

previously, Friends of the Coast was permitted to intervene in the state administrative proceeding before the Board.

## Discussion

### I.   Defendants' Motion to Dismiss

The state defendants move to dismiss this suit on grounds that the court lacks subject matter jurisdiction; that even if it has jurisdiction, the court should abstain from interfering in the Board's consideration of Maine Yankee's Site Law application; and, that Maine Yankee has failed to state a claim on which relief can be granted.  Maine Yankee objects.

Defendants first say that while the Board assumed jurisdiction over Maine Yankee's application, it did not "decid[e] whether or not it has decision-making authority over . . . radiological issues," but instead reserved that issue for "further discussion and debate."  (Tr. of 8/19/99 Board meeting at 81, Ex. G to Dec. of Mary Ann Lynch (quoted language is from a question posed by DEP Commissioner Brook Barnes, answered affirmatively by Board member Andrew Cadot).)  Defendants argue

that since the Board has not yet decided whether it has any regulatory authority over radiation-related aspects of the ISFSI, potential issues of federal preemption are not ripe for review. Defendants assert that "Maine Yankee may never have a live controversy because the Board may issue a Site Law permit which comports with Maine Yankee's views [of preemption]." (Defs.' Mot. to Dismiss at 9).

A similar argument was made in Kerr-McGee Chemical Corp. v. City of W. Chicago, 914 F.2d 820 (7th Cir, 1990), a case in which the plaintiff chemical company sought to enjoin, on federal preemption grounds, West Chicago's application of local Erosion and Sedimentation Regulations to plaintiff's construction of a disposal cell for radioactive waste. The city argued that the case was not ripe: "Since the City, if given the opportunity, might find Kerr-McGee's plans in complete compliance with the City's Code, the City submits that Kerr-McGee's suit is premature." Id. at 823. The court rejected the argument, noting that "Kerr-McGee's claim is ripe because the City is prepared to apply its Code immediately in a way that may affect the project."

Id. at 827. Maine Yankee's claim is ripe for the same reason: the Board has asserted jurisdiction to apply Maine's Site Law to Maine Yankee's planned construction of the ISFSI, and its application threatens to affect Maine Yankee's plan to move its spent fuel.

The court also rejects defendants' argument that Maine Yankee's voluntary compliance with the state's Site Law approval process in the past, and its filing the application at issue here, waives any claim that the Board lacks jurisdiction over the "environmental aspects" of the ISFSI project. (Defs.' Mot. to Dismiss at 9.) Maine Yankee has consistently maintained that the state's authority is limited by complete federal preemption of the fields of nuclear power operation and safety. It has not waived exclusive federal control over all nuclear aspects of the plant's construction, safe operation, and decommissioning (and even if it purported to "waive" federal authority, the state would not thereby obtain any ability to regulate in those areas since Congress has reserved that power to itself).

Defendants next argue that the court should dismiss the case on Younger abstention principles.  See Younger v. Harris, 401 U.S. 37 (1971).  Under the Younger doctrine, a federal court should refrain from exercising jurisdiction over a claim that implicates vital state interests and is the subject of ongoing state judicial or administrative proceedings, unless the opportunity to raise federal constitutional claims in the state proceeding is clearly lacking.  See Chaulk Servs., Inc. v. Massachusetts Comm'n Against Discrimination, 70 F.3d 1361, 1368 (1st Cir. 1995).  The doctrine is based on principles of comity and a "'proper respect for state functions.'"  Id. at 1367 (quoting Younger, 401 U.S. at 44).

Courts generally decline to apply the doctrine, however, when it appears that the subject matter of the ongoing state proceeding is preempted by federal law.  See e.g., Chaulk, 70 F.3d at 1370.  As the Court of Appeals for the Eighth Circuit noted in Middle South Energy, Inc. v. Arkansas Pub. Serv. Comm'n, 772 F.2d 404, 417 (8th Cir. 1985), the principles of comity underlying Younger are "not strained when a federal court cuts

9

off state proceedings that entrench upon the federal domain." It is readily apparent, even on this concededly abbreviated record, that the Board's authority to regulate Maine Yankee's decommissioning activities is preempted, and the Board's current course could well take it into preempted waters. So, <u>Younger</u> abstention would not be appropriate. <u>Chaulk</u>, 70 F.3d at 1370.

The state defendants also suggest that the Anti-Injunction Act, 28 U.S.C. § 2283, precludes this court from enjoining defendants from seeking to enforce Maine's Site Law in state court proceedings. The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C.A. § 2283 (West 1994). The short answer, of course, is that no state court proceeding is pending: Maine Yankee's application is pending before the Board, a state administrative agency. The Anti-Injunction Act does not prevent a federal court from enjoining either pending proceedings before a state administrative agency,

10

or the commencement of a state court proceeding not yet pending. See <u>SMA Life Assurance Co. v. Sanchez-Pica</u>, 960 F.2d 274, 276 (1st Cir. 1992)(noting, though not needing to decide the issue for this circuit in order to resolve the case before it, that "the appellate courts seem to agree that the [Anti-Injunction] Act applies only to state courts" and not to state administrative agencies); <u>Dombrowski v. Pfister</u>, 380 U.S. 479, 485 n.2 (1965) (Anti-Injunction Act does not "preclude injunctions against the institution of state court proceedings, but only bar[s] stays of suits already instituted."); <u>Hyde Park Partners, L.P. v. Connolly</u>, 839 F.2d 837, 842 n.6 (1st Cir. 1988)(same). Moreover, plaintiff's complaint alleges a cause of action under 42 U.S.C. § 1983, which brings the action within the Anti-Injunction Act's exception for injunctions "expressly authorized by Act of Congress." 28 U.S.C.A. § 2283 (West 1994); <u>see</u> <u>Gibson v. Berryhill</u>, 411 U.S. 564 (1973)(noting that § 1983 actions are exempt under the Anti-Injunction Act). So, the Anti-Injunction Act does not bar the injunctive relief sought here.

11

Defendants' final procedural argument is that the doctrines of primary jurisdiction and failure to exhaust administrative remedies bar this suit. Defendants urge the court to allow the Board to complete its administrative proceedings and determine whether or not to issue a Site Law permit, before the federal courts intervene in the matter. The argument is unavailing, however, where the pending question is whether the Board's proceedings constitute an effort by the state to impose its regulatory authority in a field preempted by Congress. See Association of Int'l Auto. Mfrs., Inc. v. Commissioner, Massachusetts Dep't of Envtl. Protection, 2000 WL 298563, at *3 (1st Cir. March 27, 2000)(finding that the court's initial invocation of the primary jurisdiction doctrine was unwise where "the ultimate legal determination of whether the Massachusetts regulations are preempted by the [federal Clean Air Act] is a question of federal preemption law for the courts alone to decide"); Volkswagen de Puerto Rico, Inc. v. Puerto Rico Labor Relations Bd., 454 F.2d 38, 41 (1st Cir. 1972)(holding that plaintiff was not required to exhaust its administrative remedies

12

before the Puerto Rico Labor Relations Board "before invoking the jurisdiction of the federal courts to determine whether the Board's assertion of jurisdiction was proper").

The state defendants also move to dismiss plaintiff's complaint for failure to state a claim on which relief can be granted. Defendants argue that because Maine Yankee's claims are not ripe for review, it has neither stated a claim under the Declaratory Judgment Act nor presented a "live controversy" sufficient to meet Article III's case or controversy requirement. The court has found, however, that plaintiff's claims are ripe, so this argument necessarily fails as well.

Finally, the state defendants say that Maine Yankee has not described a viable claim for injunctive relief, because it has failed to 1) allege irreparable harm or demonstrate that it lacks an adequate remedy at law; (2) show that the balance of harms favors granting an injunction; and (3) show that an injunction will not adversely affect the public interest. Maine Yankee did not address these points, probably because it took the position that its claim for injunctive relief need not be considered

13

immediately in light of the Board's stay of the administrative proceedings pending the outcome of this suit. Maine Yankee reserved its right to reassert its claim to injunctive relief, however, should the Board dissolve its stay and bring the administrative proceedings forward.

The Board subsequently did lift its stay, albeit at Maine Yankee's request (see letter from Attorney James T. Kilbreth to Judge Carter of 2/25/00 (document no. 18)). Nevertheless, this court deems it inadvisable to consider the claim for injunctive relief sua sponte, or rule on the motion to dismiss it, until Maine Yankee is afforded a meaningful opportunity to be heard on the matter and a complete factual record can be developed. That portion of defendants' motion to dismiss is, therefore, denied without prejudice to renewing it in the context of a developed factual proffer. (It remains unclear precisely what the state board expects or intends to do, though the tone and tenor of the argument suggests that it intends to regulate the proposed spent fuel transfer to the full extent of its authority to do so.)

14

II.  <u>Plaintiff's Motion for Partial Summary Judgment</u>

Maine Yankee has also moved for partial summary judgment on Count I of its complaint – its request for declaratory judgment. It asks the court to declare, _inter_ _alia_, that "any attempt by defendants to assert jurisdiction over the radiological health and safety aspects of the ISFSI is prohibited under and preempted by federal law." (Pl.'s Motion for Partial Summary Judgment at 1.)

Under the Supremacy Clause of Article VI of the United States Constitution, the "Laws of the United States" preempt state law.

> "Pre-emption occurs when [1] Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, [2] when there is outright or actual conflict between federal and state law, [3] where compliance with both federal and state law is in effect physically impossible, [4] where there is implicit in federal law a bar[r]ier to state regulation, [5] where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or [6] where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.
> . . .
> The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law."

15

Hyde Park Partners, 839 F.2d at 848-49 (citations omitted)

(quoting Louisiana Public Service Comm'n v. Federal

Communications Comm'n, 476 U.S. 355 (1986)).

Maine Yankee first argues that as an "Agreement State" under

42 U.S.C. § 2021(b),[3] Maine is expressly prohibited from

licensing an ISFSI by 10 C.F.R. § 72.8, which provides:

"Agreement States may not issue licenses covering the storage of

spent fuel in an ISFSI or the storage of spent fuel and high-

level radioactive waste in an MRS [Monitored Retrievable Storage

Installation]."  Maine Yankee appears to contend that any permit,

approval, or authorization a state may require in connection with

an ISFSI (e.g., the Site Law permit at issue here) qualifies as a

"license" prohibited under 10 C.F.R. § 72.8.

Section 72.8 probably should not be read so broadly.

Section 72.1 of 10 C.F.R. provides that "[t]he regulations in

this part establish requirements, procedures, and criteria for

---

[3]That section "authorized the NRC, by agreements with state governors[,] to discontinue its regulatory authority over certain nuclear materials under limited conditions."  Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development Comm'n, 461 U.S. 190, 209 (1983).

16

the issuance of <u>licenses to receive, transfer, and possess power reactor spent fuel</u> and other radioactive material associated with spent fuel storage in an [ISFSI] and the terms and conditions under which the Commission will issue such licenses . . . ." Thus, 10 C.F.R. Part 72, by its terms, deals with licenses authorizing the storage of spent nuclear fuel. The state proceeding does not, strictly speaking, involve authorizing plaintiff to receive, transfer, or possess spent nuclear fuel, but seeks to regulate, in some manner, the site development necessarily associated with its construction of an ISFSI to store spent fuel. That is, notwithstanding authorization from the NRC, the state apparently believes that unless the proposed ISFSI also meets its own site development standards, the transfer project cannot go forward. That may be so, in a very limited way – but the real question is whether the state expects to impose "site development criteria" in a manner that will frustrate or undermine the NRC's anticipated approval of the spent fuel storage transfer.

Section 72.8, of course, merely recognizes that the radiological hazards associated with spent fuel storage place that subject outside the limited areas of regulation ceded to Agreement States in 42 U.S.C. § 2021(b).  In proposing the regulations codified at 10 C.F.R. Part 72, the NRC explained:

> Licenses covering the storage of spent fuel in an ISFSI will not be issued by Agreement States because of the significant quantities of special nuclear materials involved.  Agreement States are prohibited by section 274b(3) of the act [now codified at 42 U.S.C. § 2021(b)(4)] from licensing special nuclear material in quantities sufficient to form a critical mass.

43 Fed. Reg. 46309 (1978) (supplementary information to proposed regulations later codified at 10 C.F.R. pt. 72).  Thus, the NRC unquestionably retains full regulatory authority over the radiological health and safety aspects of spent nuclear fuel storage.  See id.; see also 42 U.S.C.A. § 2021(c)(4) (West 1994) (NRC to retain authority and responsibility to regulate "the disposal of such other byproduct, source, or special nuclear material as the Commission determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the Commission.").

Nonradiological aspects of spent fuel storage, however, are still subject to some regulation by the states pursuant to 42 U.S.C.A. § 2021(k) (West 1994), which provides that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards."  So, the Site Law permit at issue here, properly construed, is not the type of license contemplated or prohibited by 10 C.F.R. § 72.8.  That does not mean, of course, that the state can indirectly regulate plaintiff's handling of spent nuclear fuel under the guise of regulatory site development (e.g., landscaping, slopes, drainage, soil erosion, etc.).

Plaintiff also argues that the Board's jurisdiction is preempted because the federal government has occupied the fields of spent fuel storage and nuclear safety in general.  Congress has legislated extensively in the field of nuclear power generation.  See the Atomic Energy Act ("AEA"), 42 U.S.C. § 2011 et seq.; the Energy Reorganization Act ("ERA"), 42 U.S.C. § 5801 et seq.; the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10101

19

_et seq_. In addition, it has granted the NRC broad rule-making and licensing authority in the field, _see_, _e.g._, 42 U.S.C.A. §§ 2131-2141, 2201(p) (West 1994 & Supp. 1999), § 5841 (West 1995), & § 10153 (West 1995). Nevertheless, Congress has not purported to occupy the entire field of nuclear power regulation, but has "preserved the dual regulation of nuclear-powered electricity generation" by the federal and state governments: "the federal government maintains complete control of the safety and 'nuclear' aspects of energy generation; the states exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like." _Pacific Gas_, 461 U.S. at 211-12.

Relying upon this distinction, the state defendants suggest that because they do not intend to directly regulate the radiological safety aspects of the contemplated ISFSI, and readily concede that they have no authority to do so under either the Site Law or the NRPA, their jurisdiction is not preempted. In other words, like the statute at issue in _Kerr-McGee Chemical Corp. v. City of West Chicago_, 914 F.2d at 826 (internal

20

quotation marks omitted), the Site Law and the NRPA "on [their] face[s] concern[] matters that are unrelated to radiological hazards." Like the plaintiff in Kerr-McGee, however, Maine Yankee is legitimately concerned that defendants "plan[] to use the [Site Law and NRPA] to frustrate the NRC licensing program." Kerr-McGee Chemical Corp. v. City of West Chicago, 914 F.2d at 827.

What defendants actually plan to regulate, and how, is hardly clear from the record before the court. One might take a hint from the Board's apparent interest in matters nuclear – its demand for the safety report on the proposed storage system for example. But, even giving appropriate deference to defendants' representations – that they do not intend to directly or indirectly regulate any radiological operational, or decommissioning aspects of Maine Yankee's ISFSI project – a substantial legal issue still remains. That is because even state laws aimed at those aspects of nuclear power plant regulation left to the states are, nevertheless, preempted if compliance with those laws and federal law is impossible, or if

21

state compliance "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Pacific Gas, 461 U.S. at 204 (internal quotation marks omitted). Thus, the Supreme Court in Pacific Gas "took great pains to make clear that state regulation of matters directly affecting the radiological safety of nuclear plant construction and operation, even if enacted out of nonsafety concerns, would nevertheless infringe upon the NRC's exclusive authority." English v. General Electric Company, 496 U.S. 72, 84 (1990) (internal quotation marks and brackets omitted).

Specifically, in Pacific Gas the court noted that a state's attempt to "regulate the construction or operation of a nuclear powerplant . . . even if enacted out of non-safety concerns, would nevertheless directly conflict with the NRC's exclusive authority over plant construction and operation." Pacific Gas, 461 U.S. at 212 (emphasis added). Accordingly, notwithstanding the state's authority over "land use" issues, Pacific Gas, 461 U.S. at 212, defendants cannot, under the guise of its radiation-neutral Site Law and environmental regulations, interfere with

22

those aspects of Maine Yankee's proposed ISFSI project that remain exclusively within the province of the NRC. Defendants have no role to play, for example, in determining whether Maine Yankee should use dry cask storage on the Wiscasset site or some other storage vehicle, as that use is authorized under Maine Yankee's operating license. See 10 C.F.R. § 72.212. Nor does the state have any authority to prevent an on-site transfer of the spent fuel – clearly an operational and nuclear safety issue. Nor does the state have any say in the selection, or specifications regarding construction of the dry cask storage containers, see 10 C.F.R. § 72.214 (List of approved spent fuel storage casks), or regarding whether the site and the installation, including the cask storage pads, are adequate to withstand the weight of the casks, or threats posed by natural phenomena such as earthquakes and tornados, or the threat of sabotage. See 10 C.F.R. § 72.212.

Moreover, while defendants have claimed authority to consider Maine Yankee's "financial capacity" (e.g. to deal with future economic contingencies related to spent fuel disposal) in

23

determining whether to issue a Site Law permit, they of course cannot employ a "financial capacity" requirement to indirectly regulate in the field of spent nuclear fuel storage. Cf. United Nuclear Corp. v. Cannon, 553 F. Supp. 1220, 1232 (D.R.I. 1982) (holding that state statute requiring nuclear processing plant that had ceased operations to post a ten million dollar, twenty year bond to cover any expenses incurred by the state in decontaminating areas surrounding the plant was preempted by federal law). That is, the state cannot stand in the way of Maine Yankee's operational fuel storage plans, once they are approved by the NRC, on grounds that the cost of future transfer or handling of the spent fuel may be high and plaintiff cannot post security satisfactory to the state to cover any economic contingencies. Cf. 10 C.F.R. § 72.30 (requiring licensees to keep certain records including "[r]ecords of the cost estimate performed for the decommissioning funding plan or of the amount certified for decommissioning, and records of the funding method used for assuring funds if either a funding plan or certification is used").

24

Defendants may, however, insist that the ISFSI comply with state requirements that do not impermissibly infringe on radiological, operational, construction, or safety issues, such as, for example, aesthetic landscaping requirements, or flood or soil erosion control measures. See Me. Rev. Stat. Ann. tit. 38, § 484 (West 1989 & Supp. 1999); see also Kerr-McGee Chemical Corp. v. City of West Chicago, 914 F.2d at 827 ("The City does indeed have the power to say 'no' to aspects of the project" that fail to comply with the City's regulations, "if they do not directly involve radiation hazards (including those 'inextricably intermixed' with nonradiation hazards) and are not selected for scrutiny by the City merely to delay or frustrate the project as a whole."). (A normal and customary performance bond requirement, designed to ensure completion of site grading, landscaping, drainage, etc., would probably be permissible, for example.)

As in Kerr-McGee, this court is reluctant to prematurely speculate that defendants intend to use Maine's Site Law to indirectly regulate what they concededly cannot regulate

25

directly. It has not been shown at this juncture that the state has acted, or intends to act beyond the scope of its legitimate authority (though plaintiff has reason to be concerned). "The mere exercise of [some form of] jurisdiction by the [defendants] does not create an irreconcilable conflict with the objectives of federal law." Id. Therefore, plaintiff's motion for partial summary judgment is necessarily denied, for now. Perhaps the state's conduct of its administrative proceedings will reveal a transparent effort to exercise regulatory authority reserved to the federal government. Perhaps not. Time will tell. If so, declaratory and injunctive relief will surely and swiftly follow.

III. Friends of the Coast's Motions

The final issues before the court relate to Friends of the Coast's motion to intervene and its answer and motion to dismiss. Maine Yankee objects to the motion to intervene, arguing that Friends of the Coast is not entitled to intervene as of right under Fed.R.Civ.P. 24(a)(2), and should not be permitted to intervene under Fed.R.Civ.P. 24(b).

26

Four conditions must be met to intervene as of right under Fed.R.Civ.P. 24(a)(2)[4]:

> First, the application must be timely. Second, the applicant must claim an interest relating to the property or transaction which is the subject of the action. Third, the applicant must be so situated that the disposition of the action may as a practical matter impair or impede her ability to protect that interest. Fourth, the applicant must show that her interest will not be adequately represented by existing parties.

Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 637 (1st Cir. 1989). Maine Yankee argues that Friends of the Coast meets none of the four conditions. However, as "[a]n applicant who fails to meet any one of these requirements cannot intervene as of right under Rule 24(a)(2)," id., the court need only address the last requirement.

Friends of the Coast says it has an interest in this suit because the outcome "will determine whether Friends of the Coast will be able to participate in the environmental decision-making of the [Board]," in order to protect the environmental and

---

[4]Friends of the Coast does not purport to intervene by authority of a federal statute as allowed by Fed.R.Civ.P. 24(a)(1).

property interests of its members. (Friends of the Coast's Mot. to Intervene at 2 (underlining omitted).) So, the interest asserted is that of ensuring that the Board's and Department's authority to require Maine Yankee's ISFSI to meet the state's Site Law and NRPA requirements is recognized. Assuming, without deciding, that this interest meets the second and third requirements for intervention as of right, it fails to meet the fourth.

Friends of the Coast's claimed interest in this case is indistinguishable from that of the state defendants, and that interest is fully represented by them. Friends of the Coast has not persuaded the court that the state defendants have failed to argue for the broadest jurisdiction legally available to them.[5] Accordingly, Friends of the Coast is not entitled to intervene as of right.

---

[5]The court finds Mr. Shadis' averment that in January, 2000, he "developed concerns that the State's will to address the concerns of Friends of the Coast was being eroded through constant lobbying by Maine Yankee" (Shadis Aff. at ¶ 16.) too ambiguous and speculative to raise a material issue regarding inadequate representation or conflict of interest.

Permissive intervention, on timely application, is authorized under Fed.R.Civ.P. 24(b)(2) "when an applicant's claim or defense and the main action have a question of law or fact in common."[6] Even assuming that condition is met here, however, intervention is still at the court's discretion. See Massachusetts Food Ass'n v. Massachusetts Alcoholic Beverages Control Comm'n, 197 F.3d 560, 568 (1st Cir. 1999), cert. denied, 2000 WL 249207 (U.S. May 1, 2000). Permissive intervention is unnecessary here, as Friends of the Coast's limited legitimate interests in this case are adequately protected by the state defendants.

However, Friends of the Coast may participate in this case as amicus curiae, if it wishes to do so. That status will enable it to present any pressing legal argument of concern to it that the state defendants have not addressed or emphasized. See id. (finding that district court did not abuse discretion in denying permissive intervention where it "reasonably concluded that the

---

[6]Friends of the Coast does not seek intervention based on a conditional right to intervene under federal statute, as provided for under Fed.R.Civ.P. 24(b)(1).

Commonwealth was adequately representing the interests of everyone concerned . . . and that any variations of legal argument could adequately be presented in amicus briefs").

Accordingly, Friends of the Coast's motion to intervene is denied. Although its answer, counterclaims, and motion to dismiss have not been objected to, the court necessarily strikes those pleadings <u>sua</u> <u>sponte,</u> as Friends of the Coast is not a party to this suit. However, Friends of the Coast shall be provided with copies of all pleadings filed by the parties, all orders and notices, and may file briefs or legal memoranda in the capacity of <u>amicus</u> <u>curiae.</u>

Conclusion

For the foregoing reasons, defendants' motion to dismiss (document no. 4), plaintiff's motion for partial summary judgment (document no. 10), and Friends of the Coast's motion to intervene (document no. 20) are denied. Friends of the Coast's answer, including defenses, counterclaims and motion to dismiss for lack of jurisdiction (document no. 21) is stricken.

**SO ORDERED.**

 

_____
Steven J. McAuliffe
United States District Judge,
by designation

May 4, 2000

cc:   James T. Kilbreth, Esq.
     Dennis J. Harnish, Esq.
     John S. Campbell, Esq.
     William S. Brownell, Clerk, (Original)
       U.S. District Court, Maine
     James R. Starr, Clerk, (Copy)
       U.S. District Court, New Hampshire
     Friends of the Coast