487 F.Supp.2d 1076 (2007)
State of MISSOURI, Plaintiff,
v.
WESTINGHOUSE ELECTRIC, LLC, Defendant.
No. 4:05 CV 0315 SNL.
United States District Court, E.D. Missouri, Eastern Division.
January 22, 2007.
*1077 *1078 Shelley A. Woods, Assistant Attorney General of Missouri, Jefferson City, MO, for Plaintiff.
C. Shawn Dryer, Babst and Calland, Pittsburgh, PA, for Defendant.

ORDER
LIMBAUGH, Senior District Judge.
This case is one of two actions before the Court involving the cleanup of environmental contamination at the Hematite Nuclear Facility. Westinghouse Electric Company purchased the Hematite Site in 2000, and shortly thereafter began to decommission the facility. However, the Hematite Site had operated as a nuclear fuel processing plant for upwards of forty years, and is contaminated with radiological and chemical wastes. Therefore, Westinghouse has been working with the United States Nuclear Regulatory Commission (NRC), and the Missouri Department of Natural Resources (MDNR) in an attempt to decontaminate the site.
In February of 2005, the State of Missouri filed suit against. Westinghouse under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607, the Missouri Hazardous Waste Management Law, Mo.Rev.Stat. § 260.350 et seq, and the Missouri Clean Water Law, Mo.Rev.Stat. § 644.006 et seq. In the Complaint, Missouri requested injunctive relief, requiring that Westinghouse perform a Remedial Investigation/Feasibility Study (RI/FS) to determine the nature and extent of the contamination and develop a plan to decontaminate the area. Missouri also demanded that Westinghouse implement the remedy selected through the RI/FS process and reimburse the MDNR for any past or future response costs incurred at the Hematite Site.
*1079 In May of 2006, the State of Missouri and Westinghouse entered, into a Consent Decree and submitted it to the Court for approval. This Consent Decree was crafted pursuant to Section 107 of CERCLA, and includes a detailed plan for the decontamination of Hematite Site. Generally, a Court gives deference to a Consent Decree, and should issue its approval if the Decree is "fair, reasonable, and faithful to the objectives of CERCLA. United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir.1990). However, this is not a general case.
As previously stated, there are two actions before this Court involving the Hematite site. The related cause of action was brought by Westinghouse against the United States of America and several other corporate Defendants, all of whom formerly owned the Hematite property and may be liable for the expenses incurred during the decontamination process. For reasons not pertinent to the Court's analysis, the Defendants in the second suit intervened in this action to protect their interests. In addition, the NRC, which is the federal agency charged with regulating the civilian use of nuclear materials, takes issue with the State of Missouri's attempt to regulate radiological waste. Accordingly, there are a multitude of parties advancing a multitude of theories as to why this Consent Decree should not be approved.[1]
I. Case & Controversy
As a preliminary manner, the Court must address the case or controversy issue raised by the Non-Governmental Intervenors. If there is no genuine case or controversy, this Court lacks jurisdiction to determine the validity of the Consent Decree.
A cause of action that lacks "truly adverse parties," is considered a collusive action and must be dismissed. Honig v. Doe, 484 U.S. 305, 340, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). However, consent decrees necessarily require a certain amount of compromise and cooperation. Otherwise, it could never be formed. As stated by the Supreme Court:
Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.
United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971).
The Non-Governmental Intervenors suggest that the State of Missouri and Westinghouse colluded in fashioning this Consent Decree. This collusion is allegedly evidenced by the fact that much of the work to be performed under the Consent Decree has already been completed. The Proponents vehemently disagree with this characterization, arguing that the Consent Decree was the result of intense arms-length negotiations between the parties. The completed work was performed pursuant to a Letter Agreement, the substance of which was to be finalized upon entry of this Consent Decree.
Upon review, the Court finds nothing that would render this Consent Decree collusive. "The Supreme Court has long *1080 endorsed the propriety of the use and entry of consent judgments." S.E.C. v. Randolph, 736 F.2d 525, 528 (9th Cir.1984) (citing United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); Pope v. United States, 323 U.S. 1, 12, 65 S.Ct. 16, 89 L.Ed. 3 (1944); Swift & Co. v. United States, 276 U.S. 311, 325-326, 48 S.Ct. 311, 72 L.Ed. 587 (1928)). And a certain amount of cooperation between the parties is to be expected. Accordingly, there is a genuine case and controversy, and the Court has jurisdiction over this action.
II. Consent Decree
In the Consent Decree, the State of Missouri seeks reimbursement for past and future costs incurred by the State in connection with the Hematite Site. Pursuant to Sections 107(a) and 113(f) of CERLA, the State is vested with the right to pursue this monetary recovery. However, the Consent Decree also requires that Westinghouse "finance and perform the Work in accordance with the Consent Decree." Consent Decree, at ¶ 11. The term "Work" encompasses:
all work and other activities [Westinghouse] is required to perform under this Consent Decree including, but not limited to, the activities set out in the RI/FS Work Plan . . . implementation of the Removal Action for Duel's Mountain and the Site Buildings and Equipment and any additional response actions agreed to by the parties.
Consent Decree at ¶ 9. The MDNR is "responsible for overseeing the proper and complete implementation of the Work under this Consent Decree" and has "the authority to halt, conduct or direct any action required by this Consent Decree, or to direct any other response action undertaken by MDNR or [Westinghouse] at the Site." Id. at ¶ 51. Duel's Mountain, the Site Buildings and Equipment, and other areas of the Hematite Site included in the RI/FS Work Plan are contaminated with uranium and other radiological and nonradiological components. Thus, through the Consent Decree, the State of Missouri is attempting to control the decontamination of a site containing radioactive contaminants.
The Intervenors take issue with Missouri's attempt to regulate the safety of radiological materials. They argue that the State has no federal authority to engage in such regulation, and that any authority under state law is pre-empted by the Atomic Energy Act (AEA), 42 U.S.C. §§ 2011-2297g-4. Proponents of the Consent Decree concede that the Consent Decree was entered into because of the State's safety concerns, but argue that the Consent Decree is not pre-empted by the AEA for the following reasons; CERCLA grants the State the power to enter into the Consent Decree; State action is not pre-empted where the facility is decommissioned, or where mixed contaminants are present; and the Consent Decree contains limiting language to avoid pre-emption.[2]
*1081 III. CERCLA
Proponents argue that a Supremacy Clause analysis does not apply because the State of Missouri brought this cause of action under CERCLA. Specifically, Proponents claim that Section 107 of CERLA gives the states authority to conduct response actions at areas contaminated with hazardous materials, including site cleanup. "The Supremacy Clause is not implicated when a case involves a potential conflict between federal statutes," Lupiani v. Wal-Mart Stores, Inc., 435 F.3d 842, 846 (8th Cir.2006). Thus, Proponents posit that the general pre-emption analysis is inapplicable to a conflict between the federal government and a state bringing suit under a federal statute.
Despite Proponents' assertions, CERCLA does not grant a state the power to regulate radioactive materials. Under Section 107 of CERCLA, any person responsible for a hazardous substance contamination is liable for "all costs of removal or remedial action incurred by the United States Government or a State," "any other necessary costs of response incurred by any other person," damages to natural resources (including the cost of assessing those damages), and the costs of health assessments and health effect studies. 42 U.S.C. § 9607(a). The Section also allows the President or an authorized representative of a State to bring suit on behalf of the public to obtain monetary relief when there are damages to natural resources. 42 U.S.C. § 9607(f). Thus, Section 107 allows a State to recover the costs incurred in a remedial action, but it does not give the State the authority to engage in any specific remedial action.
Sections 104 and 106 of CERCLA allow the President to respond to the release or threatened release of hazardous substances, taking any necessary action to control the release and decontaminate the polluted area. This includes the power to permit a responsible private party to conduct an RI/FS. However, a responsible party cannot conduct an RI/FS unless the President determines "that the party is qualified to conduct the RI/FS and only if the President contracts with or arranges for a qualified person to assist the President in overseeing and reviewing the conduct of such RI/FS and if the responsible party agrees to reimburse the Fund for any cost incurred. . . ." 42 U.S.C. § 9604(a). Therefore, CERCLA only gives response power to the President, who in turn delegated this power to the NRC.
A state can obtain authority to cleanup hazardous waste sites under CERCLA, but it must request this authority from the President. Once a state makes this request, "[i]f the President determines that the State . . . has the capacity to carry out any or all of such actions in accordance with the criteria and priorities established [by the National Contingency Plan] and to carry out related enforcement actions, the President may enter into a contract or cooperative agreement with the State . . . to carry out such actions." 42 U.S.C. § 9604(d)(1)(A). Any State under this cooperative agreement has virtually unfettered access to information regarding the type of materials at a site and the nature or extent of a hazardous substance release. It can also enter a facility to inspect the hazardous contamination and obtain samples of the materials for analysis. 42 U.S.C. § 9604(e). But the State of Missouri has not entered into a cooperative agreement with the federal government. Therefore, Missouri has no authority under CERCLA to conduct response actions at sites contaminated with radiological materials.
Because there is no federal basis for Missouri's regulatory action, the State's authority must stem from State law. *1082 Therefore, a general pre-emption analysis applies.
IV. Supremacy Clause
The Supremacy Clause requires that "the laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const., Art VI, cl. 2. In accordance with this legal tenet, a state's laws or regulations can be pre-empted through an Act of Congress through one of two general ways: field pre-emption or conflict pre-emption.
"If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). Congress may indicate its intent to occupy an entire field by so stating in express terms within the statutory text. Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 203, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Congress' intent may also be implicit through a pervasive regulatory scheme:
Congress' intent to supersede state law altogether may be found from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.
Id. at 203-04, 103 S.Ct. 1713 (internal quotations omitted). Absent field pre-emption, federal law may still supercede state law to the extent that state law actually conflicts with federal law. Conflict preemption occurs "when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Silkwood, 464 U.S. at 248, 104 S.Ct. 615 (internal citations omitted). "In each instance, the question of preemption is one of determining Congressional intent." Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1240 (10th Cir.2004). Thus, the Court's analysis must begin with an examination of the AEA.
1. The Atomic Energy Act
Before the enactment of the AEA, "the use, control, and ownership of nuclear technology remained a federal monopoly." Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n, 461 U.S. 190, 206, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). However, Congress came to believe "that the national interest would be served if the Government encouraged the private sector to develop atomic energy for peaceful purposes under a program of federal regulation and licensing." English v. Gen. Elec. Co., 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). The AEA allowed for the "private construction, ownership, and operation of commercial nuclear-power reactors under the strict supervision of the Atomic Energy Commission," which is now known as the NRC. Id. The Commission "was given exclusive authority to license the transfer, delivery, receipt, acquisition, possession, and use of all nuclear materials." Id. The federal government's prime area of concern was national security, public health, and safety. "With respect to these matters, no significant role was contemplated for the States." Id. at 81, 110 S.Ct. 2270.
Congress then amended the AEA to "clarify the respective responsibilities . . . of the States and the Commission with *1083 respect to the regulation of byproduct, source, and special nuclear materials," to "establish programs for . . . cooperation between the States and the Commission with respect to control of radiation hazards associated with use of such materials," to promote an orderly regulatory pattern between the Commission and the States with respect to the regulation of AEA materials, and "to establish procedures and criteria for discontinuance of certain of the Commission's regulatory responsibilities with respect to byproduct, source, and special nuclear materials, and the assumption thereof by the States." 42 U.S.C. § 2021(a). Through this amendment,[3] Congress authorized the Commission to enter into agreements with a state, under which the Commission would cede regulatory authority over specified radioactive or nuclear materials for the duration of the agreement.[4] 42 U.S.C. § 2021(b). However, the scope of these federal-state agreements were significantly limited. The Commission retained exclusive regulatory authority over "the construction and operation of any production or utilization facility or any uranium enrichment facility" and "the disposal of such . . . byproduct, source, or special nuclear material as the Commission determines . . . should, because of the hazards or potential hazards thereof, not be disposed of without a license from the Commission." 42 U.S.C. § 2021(c). "Congress' decision to prohibit the States from regulating the safety aspects of nuclear development was premised on its belief that the Commission was more qualified to determine what type of safety standards should be enacted in this complex area." Silkwood v. Kerr-McGee, 464 U.S. 238, 250, 104 S.Ct. 615, 78 L.Ed..2d 443 (1984).
2. Supreme Court Decisions
Since the statute's enactment, the Supreme Court has addressed the pre-emptive effect of the AEA in three main decisions: Pacific Gas, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), Silkwood, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), and English, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).
In Pacific Gas, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752, utility companies brought suit against a California agency to enjoin the enforcement of state statute that imposed a moratorium on the construction of new power plants in the state until adequate storage and disposal methods became available for nuclear waste. The utilities argued that the California statute was pre-empted by the AEA. The Supreme Court examined the text of the statute, juxtaposing the pervasive federal regulatory scheme surrounding the safety and security of nuclear materials against the "regulatory vacuum" surrounding economic issues. 461 U.S. at 207-08, 103 S.Ct. 1713. From this, the Court inferred that Congress intended for the states to continue to make economic decisions. "[W]hile the safety of nuclear technology was the exclusive business of the Federal Government, state power over the production of electricity was not otherwise displaced." Id. at 208, 103 S.Ct. 1713. The Supreme Court summarized its findings as follows:
from the passage of the Atomic Energy Act in 1954, through several revisions, and to the present day, Congress has preserved the dual regulation of nuclear-powered electricity generation: the federal government maintains complete control of the safety and "nuclear" aspects of energy generation; the states *1084 exercise their traditional authority over the need for additional generative capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like.
Id. at 211-12.
The Court noted two general areas in which state regulation is pre-empted: the construction and operation of nuclear power plants, and nuclear safety concerns. Any attempt by the state to regulate the construction and operation of nuclear power plants, "even if enacted out of non-safety concerns, would nevertheless directly conflict with the NRC's exclusive authority over plant construction and operation." Id. at 213, 103 S.Ct. 1713. In addition, the Court noted that "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." Id. Thus, a state statute would be pre-empted if its purpose was grounded in nuclear safety concerns. However, if the state moratorium was enacted for a "non-safety rationale," it was not necessarily pre-empted. Id.
The Court determined that the "avowed" purpose of the California's statute was economic in nature, thus it was not within the pre-empted field of nuclear safety, and there was no actual conflict between the California statute and the purposes of the AEA. Id. at 116, 103 S.Ct. 1713. Although the primary purpose of the AEA was to promote nuclear power, this purpose was not to be accomplished "at all costs." Id. at 222, 103 S.Ct. 1713. The states retained the power to determine whether it made economic sense to build a nuclear power plant. Thus, the Supreme Court held that the AEA did not pre-empt the California statute. Id. at 223, 103 S.Ct. 1713.
In Silkwood, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443, the Supreme Court addressed yet another pre-emption issue under the AEA: whether punitive damages could be awarded in a tort action for injuries caused by radiological contamination at a NRC licensed nuclear facility. The Court examined the legislative history of the statute, noting that the AEA "provided for continued federal control over the more hazardous materials because the technical safety considerations are of such complexity that it is not likely that any State would be prepared to deal with them during the foreseeable future."' Id. at 250, 104 S.Ct. 615 (quoting H.R.Rep. No. 1125, 86th Cong., 1st Sess. 3 (1959)). Had there been no additional evidence of Congress' intent, "this concern over the states' inability to formulate effective standards and the foreclosure of the states from conditioning the operation of nuclear plants on compliance with state-imposed safety standards arguably would disallow resort to state-law remedies by those suffering injuries from radiation in a nuclear plant." Id. at 250-51, 104 S.Ct. 615. However, the Supreme Court found "ample evidence that Congress had no intention of forbidding the states from providing such remedies." Id. at 251, 104 S.Ct. 615.
The Court found that Congress' silence on the issue of federal remedies for persons injured in NRC regulated facilities spoke volumes, as the legislature would not have removed all means of judicial recourse for injured people without comment. In addition, the legislative history surrounding amendments to the AEA evidenced Congress'"belief that the NRC's exclusive authority to set safety standards did not foreclose the use of state tort remedies." Id. at 253, 104 S.Ct. 615. In enacting and amending the AEA, Congress assumed that traditional principles of tort law would apply unless state law was expressly supplanted by federal legislation. Because Congress made this assumption, and there was no opposing legislative history to contradict it, state tort law *1085 remained a viable remedy. "It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept." Id. at 256, 104 S.Ct. 615. Thus, although an award of punitive damages could be considered regulatory in nature, "Congress did not believe that it was inconsistent to vest the NRC with exclusive regulatory authority over the safety aspects of nuclear development while at the same time allowing plaintiffs . . . to recover for injuries caused by nuclear hazards." Id. at 258, 104 S.Ct. 615. When a plaintiff brings suit for damages from radiation injuries, field pre-emption does not apply. Instead, an injured party's claim is pre-empted only where "there is an irreconcilable conflict between the federal and state standards or . . . the imposition of a state standard in a damages action would frustrate the objectives of the federal law." Id. at 256, 104 S.Ct. 615.
The third Supreme Court case on point is English v. General Electric Company, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). In English, an employee of a nuclear-fuel production facility brought suit against her employer, claiming that the employer took retaliatory action after she made nuclear safety complaints. The question before the Court was whether federal law pre-empted a state law cause of action for intentional infliction of emotional distress by a whistleblower at a nuclear plant. Id. at 74, 110 S.Ct. 2270. The Court held that the state law claim did "not fall within the pre-empted field of nuclear safety," id. at 90, 110 S.Ct. 2270, and did not conflict with a provision of the AEA that encouraged employees to report safety violations and established a procedure to protect them from any resulting retaliation. Id. at 82, 110 S.Ct. 2270.
The Court began its analysis by reiterating its findings in Pacific Gas, explaining that state regulation would be pre-empted in either of two circumstances: if it was enacted with the purpose of protecting against radiation hazards, or if state regulation directly affected radiological safety regardless of the regulation's purpose. Id. at 79, 110 S.Ct. 2270. The state tort law at issue  intentional infliction of emotional distress  was not enacted with nuclear safety issues in mind, thus the Court's analysis focused on the effect of the state law. The Court found that "not every state law that in some remote way may affect the nuclear safety decisions made by those who build and run nuclear facilities can be said to fall within the pre-empted field." Id. Instead, for a state law to be pre-empted, "it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." Id. Because the state law had no such effect, it did not lay within the pre-empted field of nuclear safety.
3. Pre-Emption Analysis
To summarize the Supreme Court opinions, the federal government occupies the field of nuclear safety, almost entirely. This field pre-emption is all encompassing where the State's stated purpose involves nuclear safety. In this case, the Hematite Site is contaminated with radiological materials, and thus falls within the purview of the AEA. According to the State's court filings, Missouri entered into the Consent Decree to ensure that Missouri's citizens were safe from the contaminants at the Hematite Site. Thus, Missouri's Consent Decree is an attempt to regulate the safety of nuclear contaminants. Under the test espoused in Pacific Gas, this Consent Decree would be preempted *1086 by the AEA. Pacific Gas, 461 U.S. at 213, 103 S.Ct. 1713 ("the test of preemption is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act"'). Nonetheless, Proponents argue that the pre-emptive effect of the AEA does not apply to this particular Consent Decree. Their arguments are as follows: the pre-emptive effect of the AEA does not apply to decommissioned nuclear facilities; the Hematite Site is partly contaminated by non-radiological materials, which are not controlled by the AEA; and the Consent Decree contains limiting language to avoid pre-emption.[5]
3. Decommissioned Nuclear Facilities
Proponents argue that the AEA only pre-empts state regulation at operating facilities. Because the Consent Decree involves a nuclear facility that is no longer in operation, they believe that the NRC does not have exclusive jurisdiction. Proponents cite no caselaw for this theory. After a thorough search, the Court concludes that no such support exists. Nonetheless, for field pre-emption to occur, Congress' intention must be "clear and manifest." Illinois v. Kerr-McGee Chem. Corp., 677 F.2d 571, 578 (7th Cir.1982). Proponents argue that this "clear and manifest" intention is not present.[6]
Contrary to the Proponents' assertions, courts have considered whether state regulation at a decommissioned nuclear facility is pre-empted by the AEA. In every instance, the courts have made no distinction between the NRC's exclusive jurisdiction over nuclear safety at a operating facility versus its jurisdiction at a decommissioned one. For example, Brown v. Kerr-McGee, 767 F.2d 1234 (7th Cir.1985) involved a site contaminated with radioactive and non-radioactive wastes. The property had housed to thorium processing plant, and the owner subsequently ceased operations and began the decommissioning processes. The plaintiffs owned property abutting the contaminated property, and sought an injunction requiring that the property owner repair or demolish dilapidated structures on the property and remove all non-radioactive hazardous wastes. The court denied this request, finding that the state law remedy stood as an obstacle to the purposes and objectives of the NRC's regulation of radiation hazards, and was pre-empted by the AEA.[7]
*1087 Accordingly, it inconsequential to the pre-emption analysis whether the nuclear facility is operational or decommissioned. The presence of radiation hazards is sufficient to give rise to the NRC's exclusive jurisdiction. See also Maine Yankee Atomic Power Company v. Bonsey, 107 F.Supp.2d 47 (D.Me.2000); United Nuclear Corporation v. Cannon, 553 F.Supp. 1220 (D.R.I.1982) (both examining AEA pre-emption issues at a decommissioned nuclear facility, and finding that the AEA would pre-empt a state's attempt to regulate nuclear materials or safety).
The NRC's interpretation of the AEA buttresses the findings in the aforementioned cases. "[T]o ascertain the presence or absence of Congressional intention to pre-empt the field of regulation in question, . . . it [is] appropriate to accord respectful consideration to the [NRC]'s construction of the statute." Northern States Power Co., 447 F.2d 1143, 1152 (8th Cir. 1971) (citing Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)). In 10 C.F.R. § 70.38, the NRC delineates its regulations and procedures concerning the decommissioning of nuclear sites, including the specific methodology to remedy contamination in buildings, ground water, and surrounding lands. " And in 10 C.F.R. § 8.4, the NRC finds that states have no jurisdiction to regulate radiological health and safety, as well as nuclear facilities:
under the pattern of the Atomic Energy Act, as amended by section 274, States which have not entered into a section 274 agreement with the [NRC] are without authority to license or regulate, from the standpoint of radiological health and safety, byproduct, source, and special nuclear material or production and utilization facilities.
10 C.F.R. § 8.4.
Following the caselaw and the NRC's interpretation of the AEA, the Court can find no basis for the Proponents argument. Whether a nuclear facility is operational or in the process of being decommissioned is irrelevant. The AEA can pre-empt state regulation of nuclear safety issues at operational and non-operational nuclear facilities.
4. Mixed Contamination
In addition to the radiological contaminants, the Hematite Site is contaminated by non-radiological components. Therefore, Proponents argue that the State of Missouri retains the right to regulate the decommissioning process. They believe that a denial of this Consent Decree would deprive the State of its right to regulate contaminants within its jurisdiction.
There is no dispute that Missouri retains jurisdiction over the non-radiological components of mixed wastes. However, Missouri made no attempt to restrict the scope of the Consent Decree to non-radiological materials. The Consent Decree sets requirements for the investigation of areas known to be contaminated with radioactive components, such as Duel's Mountain and the Site Buildings and Equipment. And Missouri retains "the authority to halt, conduct or direct any action required by th[e] Consent Decree, or to direct any other response action" at these locals. Consent Decree ¶ 51. The State does acknowledge the limits of its authority in the Decree, stating that the MDNR will not contravene certain NRC requirements. See e.g., Consent Decree ¶ 23. However, this acknowledgment does *1088 not change the Court's analysis. Had the State attempted to regulate only those areas that were contaminated by non-radiological materials or otherwise limited the scope of the Decree, the Consent Decree would have been proper as long as Missouri avoided a conflict with federal law. See Brown v. Kerr-McGee, 767 F.2d 1234 (7th Cir.1985). The State of Missouri made no such distinction. Therefore, a field pre-emption analysis remains applicable. Missouri asserts the right to act in an area that is regulated by federal law, and runs afoul of the Supremacy Clause. See Pacific Gas, 461 U.S. at 213, 103 S.Ct. 1713.
5. Limiting Language
The final question before the Court is whether limiting language within the Consent Decree saves it from pre-emption. The language reads as follows:
The parties to this Consent Decree recognize that the Hematite Site is licensed by the NRC, and that the NRC has been exercising regulatory authority over certain aspects of the cleanup Work ongoing at the Hematite Site. The NRC is not a party to this Consent Decree, and is not restricted or limited in any way by the terms of this Consent Decree, Nothing in this Consent Decree is intended to affect or diminish the NRC's jurisdiction or regulatory authority at the Hematite Site.
Consent Decree ¶ 47.
The AEA "does not impair the State authority to regulate activities of [NRC] licensees for the manifold health, safety, and economic purposes other than radiation protection." Northern States Power Co., 447 F.2d at 1151 (quoting Sen. Rep. No. 870 (1959), reprinted in 1959 U.S.C.C.A.N. 2872). However, this Consent Decree squarely addresses the State's health and safety concerns from radiological contamination. As previously stated, because the Consent Decree falls within the realm of this pre-empted field, Missouri's action is pre-empted if "the matter on which the State asserts the right to act is in any way regulated by the Federal Act." Pacific Gas & Electric, 461 U.S. at 213, 103 S.Ct. 1713 (internal quotations omitted). This limiting language may avoid a conflict with federal law, but it does not change the fact that the matter on which Missouri asserts the right to act is regulated by the AEA. Accordingly, the limiting language does not affect the Court's analysis. The Consent Decree is pre-empted by federal law.

CONCLUSION
A consent decree is a judicial act. Thus, before entering such a decree, the Court must ensure that it does not "put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence." United States v. City of Miami, Fla., 664 F2d 435, 441 (5th Cir.1981). In this case, the Consent Decree attempts to regulate the safety of a site that contains nuclear contamination  a field completely pre-empted by the Atomic Energy Act. Therefore, the Court cannot ratify this Decree.
Accordingly,
IT IS HEREBY ORDERED that the State of Missouri's Motion to Enter Consent Decree (# 38) be and is DENIED.
NOTES
[1] When speaking of the parties collectively, the Court will refer to the State of Missouri and Westinghouse as the "Proponents," and to the governmental and non-governmental intervenors as the "Intervenors."
[2] Westinghouse made two additional arguments regarding the validity of the Consent Decree. First, Westinghouse posited that the NRC worked with the MDNR throughout the decommissioning process, and that this conduct constituted a recognition of Missouri's authority. But Westinghouse provided no legal support explaining how a federal agency's conduct can undermine its ability to enforce the Supremacy Clause. Accordingly, the Court will not address this argument any further. Second, Westinghouse argued that the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq., gives a state the power to enter into this Consent Decree. However, the RCRA does not apply to "source, special nuclear, or byproduct material as defined by the Atomic Energy Act," which would include the uranium contamination at the Hematite Site. Thus, the RCRA does not grant the State authority to regulate nuclear contaminants.
[3] Although there were several other amendments to the AEA, the 1959 Amendment is the only one relevant to the Court's analysis.
[4] It is undisputed that Missouri has not entered into such an agreement with the NRC.
[5] In addition, Proponents argue that the Court should not apply a straight pre-emption analysis because Missouri is not enacting legislation. Instead, Missouri is requesting that the Court ratify a Consent Decree that compels specific response actions during the decommissioning of a nuclear site. However, all state regulation, whether it be through legislation or court filings, can be pre-empted by federal law. The form of the regulation is irrelevant to the Court's analysis. See English, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65; Silkwood, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443.
[6] Proponents also note that several Supreme Court and Appellate opinions make specific findings as to the NRC's exclusive jurisdiction over the operation of nuclear facilities, yet fail to address whether this power extends to decommissioned plants. See Silkwood v. Kerr McGee, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443; Pacific Gas v. State Energy Resources, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752; Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223 (10th Cir. 2004); United States v. Kentucky, 252 F.3d 816 (6th Cir.2001); Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir.1971). Because the jurisdictional power was not mentioned, Proponents conclude that it does not exist. However, these cases did not involve decommissioned nuclear facilities, thus there was no reason for the courts to speak on the issue. There is no implication to be drawn.
[7] The Court applied a conflict pre-emption analysis, because plaintiffs only requested that the non-radiation hazards be removed. However, the non-radiation hazards were inexorably intermixed with radioactive materials, so the property owner could not remove one without the other. Thus, the plaintiff's request stood as an obstacle to the NRC's efforts to regulate the disposal of radioactive materials. Brown, 767 F.2d at 1240-42.