# United States Court of Appeals for the Federal Circuit

———————————

**VERMONT YANKEE NUCLEAR POWER CORPORATION,**
*Plaintiff-Cross Appellant,*

**v.**

**ENTERGY NUCLEAR VERMONT YANKEE, LLC, AND ENTERGY NUCLEAR OPERATIONS, INC.,**
*Plaintiffs-Cross Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

———————————

2011-5033, -5034, -5042

———————————

Appeals from the United States Court of Federal Claims in consolidated case nos. 02-CV-898 and 03-CV-2663, Judge Thomas C. Wheeler.

———————————

Decided: June 13, 2012

———————————

RICHARD J. CONWAY, Dickstein Shapiro LLP, of Washington, DC, argued for plaintiff-cross appellant, Vermont Yankee Nuclear Power Corporation, of Washington, DC.

BRAD FAGG, Morgan, Lewis & Bockius LLP, of Washington, DC, argued for plaintiffs cross appellants Entergy Nuclear Operations, Inc., et al.  Of counsel on the brief was L. JAGER SMITH, Wise, Carter, Child & Caraway, P.A., of Jackson, Mississippi.

ANDREW P. AVERBACH, Trial Attorney, United States Department of Justice, of Washington, DC, argued for defendant-appellant.  With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and HAROLD D. LESTER, JR., Assistant Director Of counsel on the brief were MARIAN E. SULLIVAN, JEREMIAH M. LUONGO, MARIANA T. ACEVEDO, SETH W. GREENE, JOSEPH D. KELLER, and DANIEL G. KIM, Trial Attorneys; and JANE K. TAYLOR, Office of General Counsel, United States Department of Energy, of Washington, DC.

KYLE H. LANDIS-MARINELLO, Assistant Attorney General, Office of the Attorney General, State of Vermont, Montpelier, Vermont, for amicus curiae.  With him on the brief was GAVIN J. BOYLES, Assistant Attorney General.

---

Before BRYSON, MAYER, and DYK, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK, in which *Circuit Judge* MAYER joins except for Part I(C), and in which *Circuit Judge* BRYSON joins except for Part III (B), (D), and (F).  Opinions dissenting in part filed by *Circuit Judges* MAYER and BRYSON.

DYK, *Circuit Judge.*

This case involves the federal government's breach of a contract requiring it to accept for disposal spent nuclear fuel generated at the Vermont Yankee Nuclear Power

Station ("VYNPS"). The government, the current owner of VYNPS, Entergy Nuclear Vermont Yankee, LLC ("ENVY"),[1] and the former owner of VYNPS, Vermont Yankee Nuclear Power Corporation ("Vermont Yankee"), each appeal from a judgment of the Court of Federal Claims ("Claims Court") awarding damages to ENVY for breach of the contract. Because the government agrees that it breached the contract, all issues on appeal concern either the assignment of the contract (or contract claims) from Vermont Yankee to ENVY or the measure of damages.

In Part I of this opinion, we hold that Vermont Yankee validly assigned to ENVY pre-existing claims against the government under the Standard Contract for Disposal of Spend Nuclear Fuel and/or High-Level Radioactive Waste, 10 C.F.R. § 961.11 (1984) (hereinafter "Standard Contract"). We also hold that while the partial assignment of rights and duties under the Standard Contract from Vermont Yankee to ENVY was not valid, the government nonetheless waived its right to object to the partial assignment.

In Part II, we hold that the scope of the assignment from Vermont Yankee to ENVY encompassed the claims Vermont Yankee asserted against the government, including the claim for pre-sale mitigation costs and the claim for the diminution in value of VYNPS.

In Part III, we hold that legal and lobbying fees incurred by ENVY to secure approval from the State of Vermont for a dry storage facility were foreseeable. We hold, however, that other state-imposed requirements were not foreseeable, and hence not recoverable, including

---

[1]    ENVY's sister company, Entergy Nuclear Operations, Inc., also joins ENVY as a Plaintiff-Cross Appellant. For simplicity, we refer only to ENVY in this opinion.

payments into Vermont's Clean Energy Development Fund, performance of a flood analysis, and construction of a visual barrier to the dry storage facility.

In Part IV, we hold that ENVY did not meet its burden of proof with respect to its claimed damages for the costs of disposing of contaminated material discovered due to the breach and the characterization of spent fuel moved to dry storage.

In Part V, we discuss the remaining issues, which are for the most part controlled by our recent precedents. In accordance with those precedents, we hold that ENVY is not entitled to recover its cost of capital to fund its mitigation activities. And while we hold that ENVY is entitled to recover its capital suspense loader overhead costs, we hold that, due to insufficient argument on appeal, ENVY is not entitled to recover its Resource Code 19 payroll loader overhead costs.

BACKGROUND

This is another in a long series of cases in which the government breached a commitment for the disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"). Briefly, the background is as follows. In 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat. 2201 (1983) (codified as amended at 42 U.S.C. §§ 10101-10270 (2006)). The NWPA authorized the Department of Energy ("DOE") to enter into contracts with nuclear facilities for the disposal of SNF and HLW. 42 U.S.C. § 10222. Congress expressly mandated that, under the terms of the contracts, DOE accept SNF and HLW "beginning not later than January 31, 1998." *Id.* § 10222(a)(5)(B). Contemplating the potential sale of nuclear facilities, the NWPA also provided that "[t]he rights and duties of a party to a contract entered into under this [Act] may be assignable

with transfer of title to the spent nuclear fuel . . . involved." *Id.* § 10222(b)(3).

Pursuant to its authority under the NWPA, DOE promulgated regulations defining the terms of the Standard Contract to be executed with nuclear facilities. *See* 42 U.S.C. § 10222(a)(1); 48 Fed. Reg. 5,458 (Feb. 4, 1983) (proposed rule); 48 Fed. Reg. 16,590 (Apr. 18, 1983) (final rule). Consistent with section 10222(b)(3), the Standard Contract provided: "The rights and duties of the Purchaser may be assignable with transfer of title to the SNF . . . involved; *provided, however*, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer." 10 C.F.R. § 961.11, art. XIV; *see also* J.A. 120.

In June 1983, DOE entered into a Standard Contract with Vermont Yankee for the disposal of SNF stored at the VYNPS facility. In consideration for DOE's commitment to dispose of SNF, the Standard Contract required the utilities to pay fees to DOE. First is a one-time fee that is based on any SNF generated prior to April 1983. Payment of this one-time fee may be deferred with interest until anytime prior to the beginning of DOE's performance. Vermont Yankee had been producing SNF since 1972, and was thus obligated to pay the one-time fee for disposal of its pre-1983 SNF. Vermont Yankee elected to defer the payment of the one-time fee, which at the time of this action, has not yet been paid. Second, contract holders must pay a continuing quarterly fee based on the amount of electricity generated and sold during that quarter by the utility. This fee has been paid by Vermont Yankee and ENVY during the period of their ownership of VYNPS and accepted by the government.

DOE failed to begin accepting and disposing of SNF from Vermont Yankee and other utilities in the nuclear

industry by January 31, 1998. On August 15, 2001, Vermont Yankee entered into a Purchase and Sale Agreement ("PSA") with ENVY. On July 31, 2002, the parties completed the sale of VYNPS, including title to all of the SNF generated and stored at VYNPS. The PSA expressly provided that "[Vermont Yankee] shall assign to [ENVY] the DOE Standard Contract, except for the obligation to pay the one time fee." J.A. 241. The PSA further provided that Vermont Yankee transferred to ENVY "any claims of [Vermont Yankee] related to [DOE]'s defaults under the DOE Standard Contract accrued as of the Closing, whether relating to periods prior to or following the Closing." J.A. 197. The assignment excluded "claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983." J.A. 197.

In a letter dated July 31, 2002, ENVY notified DOE "that Vermont Yankee ha[d] . . . assigned its right, title, and interest" under the Standard Contract to ENVY, and that ENVY would "assume and discharge the obligations of Vermont Yankee under the [Standard] Contract in lieu of Vermont Yankee." J.A. 268. In a letter dated August 21, 2002, Vermont Yankee similarly notified DOE that it had transferred to ENVY "its title to Spent Nuclear Fuel" at VYNPS along with "its rights and duties under the [Standard] Contract." J.A. 269. The Vermont Yankee letter also notified DOE that it had "retained the rights to any and all damages and other remedies that might accrue under from [DOE]'s breach of its obligations under the [Standard] Contract to the extent of the one-time fee for fuel used to generate electricity prior to April 7, 1983." J.A. 269. However, neither letter notified DOE that Vermont Yankee had also retained the obligation to pay the one-time fee prior to DOE's performance. This reservation was not discovered by the government until it

obtained a copy of the PSA during document production in this case in 2006.

As a result of DOE's breach, and as mitigation, ENVY concluded that it should construct an on-site dry-storage facility to provide for the interim storage of SNF at VYNPS. Pursuant to federal regulations and ENVY's pre-existing license with the Nuclear Regulatory Commission ("NRC"), ENVY was permitted to construct a dry-storage facility implementing a system that had been previously approved by the NRC. However, as discussed below, ENVY claims that it incurred other expenses in order to obtain approval from the State of Vermont to construct the facility, including: (1) legal and lobbying fees; (2) payments into Vermont's Clean Energy Development Fund; (3) the cost of performing a flood analysis; and (4) the cost of constructing a visual barrier.

On November 12, 2003, ENVY filed an action in the Claims Court for damages caused by DOE's breach of contract. The Claims Court consolidated ENVY's action with a separate action brought by Vermont Yankee asserting claims arising out of its pre-sale ownership and operation of VYNPS. *See Entergy Nuclear Vt. Yankee, LLC v. United States*, 95 Fed. Cl. 160, 167 (2010).

We have previously held that DOE's failure to begin collecting SNF constituted a partial breach of the Standard Contract. *Me. Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract—the entire nuclear electric industry."); *see also N. States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000).

The government admitted liability for its breach of the Standard Contract, and the Claims Court awarded ENVY $34,895,467 in undisputed damages, the largest portion of which was for the construction of the dry stor-

age facility. However, the government, ENVY, and Vermont Yankee disputed the government's liability for various categories of damages, and this dispute continues on appeal.[2]

Through determinations at summary judgment and after trial, the Claims Court resolved the disputed claims as follows.[3] The Claims Court held at summary judgment that the assignment from Vermont Yankee to ENVY of pre-existing claims against the government was valid, and that, contrary to the government's position, the partial assignment from Vermont Yankee to ENVY of the rights and duties under the Standard Contract was also valid. *Vt. Yankee Nuclear Power Corp. v. United States* ("*Vermont Yankee I*"), 73 Fed. Cl. 236, 240-42 (2006). The Claims Court also held at summary judgment that Vermont Yankee had unambiguously assigned to ENVY the claims it asserted against the government for the cost of its pre-sale mitigation activities and the diminution in value of VYNPS. *Vt. Yankee Nuclear Power Corp. v. United States* ("*Vermont Yankee II*"), 84 Fed. Cl. 339, 346-47 (2008).

---

[2] The government also disputed four categories of damages before the Claims Court that are not involved in this appeal.

[3] Prior to the trial, Claims Court also entered a Rule 54(b) final judgment dismissing Vermont Yankee's claims. In an initial appeal, we determined that because "Vermont Yankee and ENVY have each claimed relief for the same alleged wrong, and . . . that pursuant to the [PSA] only one of them can recover," "the claims [were] too intertwined for entry of judgment pursuant to Rule 54(b) as to only one party." *Vt. Yankee Nuclear Power Corp. v. United States*, 346 F. App'x 589, 591 (Fed. Cir. 2009). Accordingly, we ordered the Claims Court to vacate the Rule 54(b) judgment. *Id.*

In addition to the undisputed portion of ENVY's damages claim, the Claims Court awarded ENVY its claimed costs of securing state approval for the dry storage facility, including: (1) legal and lobbying fees; (2) payments into the Vermont Clean Energy Development fund; (3) performance of a river flood analysis; and (4) construction of a visual barrier to the dry-storage facility. *Entergy Nuclear*, 95 Fed. Cl. at 184, 190. The Claims Court also awarded ENVY damages for its claimed costs of (1) disposing of contaminated material discovered due to the breach; and (2) characterizing the SNF moved into on-site dry storage. *Id.* at 190-92.

Finally, the Claims Court decided two issues that have since been determined by our recent precedent. The Claims Court denied damages for ENVY's cost of capital to fund its mitigation activities (consistent with our precedent) and denied ENVY's overhead costs calculated via its capital suspense loader (contrary to our precedent). *Id.* at 194-97. In addition, the Claims Court denied damages for ENVY's overhead costs calculated via its Resource Code 19 payroll loader. *Id.* at 195-96.

The parties timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3). We review legal conclusions of the Claims Court de novo. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Factual findings are reviewed for "clear error." *Id.*

DISCUSSION

I Assignment

The government argues that the NWPA's assignment provision does not allow for either the assignment of claims under the Standard Contract or a partial assignment of the contract itself from Vermont Yankee to ENVY.

A

The government first argues that the NWPA's assignment provision does not allow for the assignment to ENVY of claims against the government previously accrued by Vermont Yankee under the Standard Contract. In general, the Assignment of Claims Act ("Claims Act") bars the assignment of claims against the United States government unless the assignment is made "after [the] claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." 31 U.S.C. § 3727(b). However, the restrictions of the Claims Act may be waived by the government either by an express contractual provision or otherwise. *See, e.g.*, *Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 891-93 (Fed. Cir. 2008). With respect to the assignment provisions in the NWPA and the Standard Contract, we recently held that "Congress' intent is manifest in the plain language of the NWPA: a party to the Standard Contract may assign its rights," including "the party's right to collect damages incurred due to an existing, ongoing breach." *Dominion Res., Inc. v. United States*, 641 F.3d 1359, 1363 (Fed. Cir. 2011). The government now concedes that our decision in *Dominion Resources* "disposes of the claim assignment issue." Appellant's Reply Br. 16. Accordingly, we affirm the Claims Court's holding that the assignment of pre-existing claims from Vermont Yankee to ENVY was valid.[4]

B

The government also argues that the NWPA's assignment provision does not allow for the partial assign-

---

[4] The assignability of claims has no bearing on the assignability of continuing rights and obligations of a government contract, which, as discussed below, is governed by the Assignment of Contracts Act.

ment of the rights and obligations designated in the Standard Contract, and in particular does not allow a partial assignment where Vermont Yankee retained the obligation to pay the one-time fee.

For contracts with the federal government, the Assignment of Contracts Act ("Contracts Act") provides:

> No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.

41 U.S.C. § 15(a) (2006).[5] Our precedents have established that the government may consent to or waive any objections it may have to assignments that would otherwise be in violation of the Contracts Act. *See Tuftco Corp. v. United States*, 614 F.2d 740, 745-46 (Ct. Cl. 1980). Specifically, our predecessor court noted that the government may recognize the validity of an assignment outside the bounds of the Contracts Act by its "course of conduct, its statements to the parties and its dealings with the assignee." *Id.* at 745.

Here, the Standard Contract allows for the assignment of the rights and duties of the Standard Contract, but says nothing about the validity of partial assignments. Further, the Standard Contract expressly re-

---

[5] 41 U.S.C. § 15 was recodified on January 4, 2011, in substantially similar form, at 41 U.S.C. § 6305. Because section 15 was still in effect at the time of the disputed assignment, we will refer to that section for the purposes of this appeal.

quires a "transfer of title to the [SNF] . . . involved" along with an assignment of the "rights and duties" of the contract holder. J.A. 120; *see also* 10 C.F.R. § 961.11, art. XIV. Indeed, we have recognized that "[a] party to a standard contract cannot transfer its rights and duties to another party without also transferring title to the SNF." *Dominion Res.*, 641 F.3d at 1363. This requirement that the rights and duties of the Standard Contract must be tied to the title of the involved SNF suggests that all of the rights and duties under the Standard Contract must be assigned together.

Moreover, under standard contract law, assignments are generally not permitted in situations where they would disadvantage the obligor. "A contractual right can be assigned unless (a) the substitution of a right of the assignee for the right of the assignor would . . . materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance . . . ." Restatement (Second) of Contracts § 317(2) (1981). "What is . . . an increase in burden or risk . . . depends on the nature of the contract and on the circumstances." *Id.* cmt. d. But at the least, "if the obligor is to perform in exchange for the promise of one person to render a return performance at a future time, substitution of the return promise of another impairs the obligor's expectation of counter-performance." *Id.* Here, the government has a strong interest in having all of the rights and duties under the Standard Contract, including the obligation to pay the one-time fee, reside in the same party. Requiring any assignments of the Standard Contract to be complete would ensure that the government would only have to deal with a single party in order to secure return performance or to resolve potential disputes.

Vermont Yankee nonetheless argues that its retention of the obligation to pay the one-time fee puts the government at no greater risk than would exist without the partial assignment. According to Vermont Yankee, this is because DOE does not have to perform under the Standard Contract until after the one-time fee is paid, assuming that, unlike the present situation, the government were otherwise willing to perform.[6] But DOE has an overarching interest in the goals of the NWPA, that is, to establish a federal program "for the disposal of . . . spent nuclear fuel." 42 U.S.C. § 10131(b)(2). Thus, any additional risk that the SNF could not be properly disposed of (because of a non-payment or a delayed payment of the one-time fee) would disadvantage the government.

For these reasons, we disagree with the Claims Court's conclusion that "[t]he range of assignments permitted under the NWPA . . . extends to the 'partial' assignment of rights and duties created by the Standard Contract." *Vermont Yankee I*, 73 Fed. Cl. at 240.

C

However, an improper assignment does not automatically nullify the contract; rather it gives the government the option to nullify the contract. *See Tuftco Corp.*, 614 F.2d at 745. As described above, the government's right to void an assignment under the Contracts Act can be waived. *See id.* at 745-46. Here, the government became

---

[6] The government argued below that it had no duty to perform, and thus could not be held liable for partially breaching the Standard Contract until after the one-time fee was paid. *See Vermont Yankee I*, 73 Fed. Cl. at 243. However, the Claims Court held that payment of the one-time fee was not yet due, and thus Vermont Yankee's deferral of the one-time fee did not excuse the government's failure to perform. *Id.* at 244. The government does not raise that issue on appeal.

aware of the assignment and continued to accept post-assignment payments of the quarterly fee from ENVY for six years from 2006 (when it discovered the partial nature of the assignment) up to the present. At the same time, the government sought to invalidate the assignment at summary judgment, arguing that "[b]ecause the contract assignment to ENVY [was] defective, ENVY does not have any privity of contract with DOE." Defendant's Motion for Summary Judgment Regarding the Invalid Assignment of Plaintiff's Standard Contract at 2, *Vermont Yankee I*, 73 Fed. Cl. 236 (No. 03-2663C). While, as the dissent points out, this course of conduct would not necessarily waive the government's right to sue for damages for breach of contract, it most assuredly prevents the government from seeking to undo (or to refuse to recognize) the assignment of the Standard Contract from Vermont Yankee to ENVY. The receipt of benefits is directly inconsistent with the refusal to recognize the validity of the assignment.

In comparable situations, it is well established that the continued receipt of benefits under a contract bars the non-breaching party from seeking to rescind the contract and secure restitution. As the Supreme Court stated in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 622 (2000), "acceptance of performance under a once-repudiated contract can constitute a waiver of the right to restitution that repudiation would otherwise create." Following *Mobil Oil*, we have held that it "is clear that the receipt of partial performance by the plaintiff will bar restitution." *Old Stone Corp. v. United States*, 450 F.3d 1360, 1371-74 (Fed. Cir. 2006) (finding that plaintiff's continued receipt of benefits waived the right to restitution, but not the right to re-

cover damages).[7]  The cases cited by the dissent are not to the contrary.  Each involved a situation in which the non-breaching party was held entitled to sue for partial breach, despite the continued receipt of benefits because the non-breaching party supplied timely notice of the breach.  There is no inconsistency between the receipt of benefits and a suit for partial breach.  None of those cases involved a situation in which the non-breaching party sought to undo the contract in its entirety.[8]

Accordingly, we hold that the partial assignment of the Standard Contract from Vermont Yankee to ENVY is effective.

---

[7]    *See also* Richard A. Lord, *Williston on Contracts* § 39:32 (4th ed. 2000) ("When one party commits a material breach of contract, the other party has a choice between two inconsistent rights—he or she can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach—but the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain."); *id.* § 40:1 ("[I]f a party in default under a contract is allowed to continue to perform, this precludes any right of the other party to rescind the contract or declare a material breach and refuse to further perform . . . .").

[8]    *See Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1356 (Fed. Cir. 2005) (plaintiff seeking reliance damages); *N. Helex Co. v. United States*, 455 F.2d 546, 555 (Ct. Cl. 1972) (plaintiff seeking remainder of full payment after the acceptance of partial payment); *Inland Trucking Corp. v. United States*, 281 F.2d 457, 458 (Ct. Cl. 1960) (plaintiff seeking withheld portions of final payment).

## II  Scope of the Partial Assignment

Vermont Yankee challenges the Claims Court's holding that it had transferred to ENVY each of the claims it brought against DOE in this case. Vermont Yankee argues that it retained its pre-closing mitigation costs claims and its diminution-in-value claim.

Under the section entitled "Transfer of Assets," the PSA provided:

> Upon the terms . . . contained in this Agreement, at the Closing [Vermont Yankee] will sell, assign, convey, transfer and deliver to [ENVY], and [ENVY] will purchase, assume and acquire from [Vermont Yankee], . . . all of [Vermont Yankee]'s right, title and interest immediately prior to the Closing in and to all of the properties and assets constituting or used in the operation of the [VYNPS] Facility . . . .

J.A. 195-96 (PSA § 2.1). Specifically listed amongst the transfer of assets were the following:

> (n) Subject to Section 6.11(b), *any claims of [Vermont Yankee] related to the Department of Energy's defaults under the DOE Standard Contract accrued as of the Closing*, whether relating to periods prior to or following the Closing, *excluding such claims as may relate to the one-time fee* with respect to fuel used to generate electricity prior to April 7, 1983[.]

J.A. 197 (emphasis added) (PSA § 2.1(n)). As noted in section 2.1(n) of the PSA, the transfer of claims was subject to section 6.11(b). That section, under the title of "Spent Nuclear Fuel Fees," provided:

(b) [Vermont Yankee] agrees, upon receipt of at least 30 days advance written notice from [ENVY] of the date on which the one-time fee for fuel burned prior to April 7, 1983 under the DOE Standard Contract will become due and payable in accordance with the terms of the DOE Standard Contract, to cause such fee to be duly paid when due, *subject to any rights of set-off to which [Vermont Yankee] may be entitled by reason of the Department of Energy's defaults under said DOE Standard Contract.*

J.A. 241 (emphasis added) (PSA § 6.11(b)). Under "Excluded Assets," the PSA similarly listed the following:

(i) The Vermont Yankee Spent Fuel Disposal Trust and claims of [Vermont Yankee] related or pertaining to [DOE]'s defaults under the DOE Standard Contract to the extent applicable to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983[.]

J.A. 198 (PSA § 2.2(i)).

The Claims Court found that while Vermont Yankee's claims "may stem from the pre-1983 fuel, they are unrelated to the one-time fee," and were thus not retained by Vermont Yankee under the terms of the PSA. *Vermont Yankee II*, 84 Fed. Cl. at 347. It is not perfectly clear what exactly is included in the "set-off" referred to in the "Spent Nuclear Fuel Fees" section. But Vermont Yankee does not argue that the claims in question are related to the one-time fee. Rather, Vermont Yankee argues that the "set-off" encompassed in 6.11(b) is not limited to items related to the one-time fee, but instead covers claims for costs "related to DOE's breach of and default on its duty to pick up the pre-April 7, 1983 SNF for which Vermont Yankee agreed to pay the one-time fee." Vermont Yankee

Br. 21. Vermont Yankee's interpretation of the PSA is not plausible, and the PSA is clear that claims not related to the one-time fee are not excluded from the transfer to ENVY.

Thus, we affirm the Claims Court's holding that Vermont Yankee transferred to ENVY its claims for pre-closing mitigation costs and diminution in value, and that Vermont Yankee could not assert those claims in this litigation.

### III  Vermont Legislation-Related Costs

The government challenges the Claims Court's award of $9,608,189 in damages for the costs incurred to obtain approval from the State of Vermont to build an on-site dry storage facility.

### A

At the time Vermont Yankee signed the Standard Contract in 1983, Vermont required that utilities obtain legislative approval prior to constructing a "facility for deposit, storage, reprocessing or disposal of spent nuclear fuel."  Vt. Stat. Ann. tit. 10, § 6501 (1982).  Vermont Yankee enjoyed a company-specific statutory exemption for the "temporary storage . . . of spent nuclear fuel."  *Id.* § 6505.  But after the 2002 sale of VYNPS to ENVY, the Attorney General of Vermont rendered an opinion in 2004 stating that the statutory exemption did not extend to ENVY as the successor of Vermont Yankee.  After unsuccessfully lobbying the Vermont general assembly to extend the exemption, ENVY commenced negotiations with the state to gain separate legislative approval.

On June 3, 2005, the Vermont state legislature enacted the Dry Cask Storage Authorization Act ("Dry Storage Act").  The Dry Storage Act approved the construction of a dry storage facility contingent on ENVY's:

(1) obtaining a Certificate of Public Good ("Certificate") from the Vermont Public Service Board ("Board") pursuant to Vt. Stat. Ann. tit. 30, § 248; and (2) complying with the terms of a spent fuel storage Memorandum of Understanding, which had been negotiated with the Vermont Department of Public Service and was also signed on June 21, 2005. *See* Vt. Stat. Ann. tit. 10, § 6522 (2012); *see also Entergy Nuclear*, 95 Fed. Cl. at 176. ENVY received the required Certificate from the Board and entered into the Memorandum of Understanding ("Memorandum"). The Memorandum and the Certificate, however, imposed multiple requirements on ENVY. The Memorandum required ENVY to pay, over the course of several years, a total of $15,625,000 into the Clean Energy Development Fund, which was also established by the Dry Storage Act. *See* Vt. Stat. Ann. tit. 10, § 6523 (2010) (recodified at Vt. Stat. Ann. tit. 30, § 8015 (2012)). Due to the perceived inadequacy of an NRC-required flood analysis relating to storage safety, the Certificate required ENVY to conduct an additional flood analysis to demonstrate that the dry storage facility was not vulnerable to potential flooding. The Memorandum also required ENVY to construct a visual barrier on two sides of the dry storage facility.

ENVY seeks: (1) $3,385,783 for legal and lobbying costs; (2) $5,625,000 for contributions made to the Vermont Clean Energy Development Fund during the period in question here; (3) $184,552 for the performance of a river flood analysis; and (4) $412,854 for the construction of a visual barrier to the dry-storage facility. Though we affirm the award of damages for ENVY's legal and lobbying fees, we hold that the Claims Court clearly erred in awarding damages to ENVY for payments made into the Vermont Clean Energy Development fund, performance of a flood analysis, and construction of a visual barrier.

B

The government challenges that these costs were not foreseeable at the time of contracting in 1983. As we held in *Indiana Michigan*, 422 F.3d at 1373, damages must be "reasonably foreseeable by the breaching party at the time of contracting." *See also Williston on Contracts* § 64:29 ("[T]he defendant [must have] had reason to foresee [the damages] as a probable result of the defendant's breach when the contract was made."). ENVY contends that the foreseeability requirement for each of the above listed categories is satisfied because the need to construct additional on-site facilities was foreseeable. There is no need, ENVY argues, to establish foreseeability of each particular type of cost incurred. This is incorrect.

The Restatement and relevant treatises have uniformly set forth the relevant standard and make clear that a plaintiff must show that the type of damages are foreseeable as well as the fact of damage. "[D]amages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." Restatement (Second) of Contracts § 351. Although this does not require "actual foresight" that the breach will cause a "specific injury or a particular amount in money[,] . . . the injury actually suffered [still] must be *one of a kind that the defendant had reason to foresee* and of an amount that is not beyond the bounds of reasonable prediction." Joseph M. Perillo, 11 *Corbin on Contracts* § 56.7, at 108 (rev. ed. 2005) (emphasis added). "[R]emoteness in space and time and the number of intervening events have obvious bearing on foreseeability." *Williston on Contracts* § 64:13.

These principles have been adopted in our cases. While a "specific loss" need not be foreseeable, *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1364

(Fed. Cir. 2010), it is well-established that "a plaintiff must prove that . . . [the] *type* of damages were foreseeable," *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (emphasis added). Similarly, our predecessor court in *Gardner Displays Co. v. United States*, 346 F.2d 585, 589 (Ct. Cl. 1965), held that "consequential damages involves consideration of the type of loss foreseeable by the contracting parties at the time of their agreement." Unquestionably, "the foreseeability prong applies to the type of loss." *Sacramento Mun. Util. Dist. v. United States*, 293 F. App'x 766, 771 (Fed. Cir. 2008).

In keeping with this general rule, we have held that plaintiffs cannot recover breach of contract damages where the type of loss was not foreseeable. For example, in *Old Stone*, 450 F.3d 1360, a *Winstar* case, the plaintiff holding company was forced to sell valuable subsidiary entities in order to mitigate the government's breach and did not have those assets available to help it solve other problems not caused by the breach. This resulted in seizure of the thrift. We held that damages resulting from the seizure were not foreseeable because the plaintiff did not establish that "this extended chain of causation was foreseeable." *Id.* at 1376. We explained:

> [E]ven if the need for replacement capital was foreseeable [as a result of the government's breach], that hardly establishes that the adverse consequences alleged to flow from the need to make [capital] infusions were foreseeable . . . . "[T]he mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that *actually occurred* was not foreseeable."

*Id.* (quoting Restatement (Second) of Contracts § 351 cmt. a). Similarly, in *Landmark Land*, the plaintiff land

holding company, which had acquired a struggling thrift pursuant to a contract with the government, later transferred almost all of its land holdings to that struggling thrift in order to receive favorable tax treatment. 256 F.3d at 1369-71. When the thrift was later seized as a result of the government's breach, we held that it was not foreseeable at the time of contracting that the plaintiff would have transferred essentially all of its assets to the struggling thrift, and we therefore denied plaintiff's damage claim for the value of those assets. *Id.* at 1378-79; *see also Anchor Savings*, 597 F.3d at 1364 (explaining that "the mere circumstance that some loss was foreseeable may not suffice to impose liability for a particular type of loss that was so unusual as not to be foreseeable" (quoting E. Allan Farnsworth, *Farnsworth on Contracts* § 12.14, at 262 (3d ed. 2004))); *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1301 (Fed. Cir. 1986) (finding government could not have foreseen that holding over on its lease would cause the landlord to lose a tenant for "other property in excess of that occupied by the government"). This foreseeability standard has also been applied in SNF cases. In *Indiana Michigan*, we held that the utility's "high cost" and "speculative" investment in an alternative out-of-state private storage facility, was unforeseeable even though we also determined that "DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF." 422 F.3d at 1376.

This is not a case like *Citizens Federal Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007), another *Winstar* case where the adverse tax consequences of the plaintiffs' mitigation activities were foreseeable because they existed in the code at the time of the transaction. Nor is this case like *Anchor Savings*, where it was foreseeable that acquiring thrifts would have to sell investments to

raise regulatory capital because the government previously "needed and expected" acquiring thrifts like Anchor Savings "to leverage its [later disallowed] goodwill into [those] profitable investments." 597 F.3d at 1362.

C

The question is whether ENVY has established the foreseeability of the costs incurred to secure approval for the dry storage facility from the State of Vermont. With respect to the legal and lobbying expenses incurred by ENVY to secure state approval of the dry storage facility, we agree that ENVY has established foreseeability.

At the time the Standard Contract was signed in 1983, it was foreseeable that at least some form of approval was required by the State of Vermont for the construction of a dry storage facility at VYNPS. For example, a Vermont statute, enacted in 1977, provided that:

> No facility for deposit, storage, reprocessing or disposal of spent nuclear fuel elements or radioactive waste material shall be constructed or established in the state of Vermont unless the general assembly first finds that it promotes the general good of the state and approves, through either bill or joint resolution, a petition for approval of the facility.

Vt. Stat. Ann. tit. 10, § 6501(a). Although an exception to the statute was adopted in 1979 specifically for Vermont Yankee, *see* id. § 6505, and even though ENVY may have itself believed that this exception was transferable, it was still foreseeable that approval from the Vermont legislature might have been required for ENVY. The assignment provision in the Standard Contract shows that the sale of VYNPS and the assignment of the Standard Con-

tract was foreseeable. And the fact that the legislature had gone so far as to create an exemption that applied only to Vermont Yankee suggested that there may be further legislative action in the future related to that exemption or that the exemption would not extend to a potential successor.

The statute required approval from the state legislature based on its finding that the dry storage facility "promote[d] the general good of the state." While the specific amount of legal and lobbying fees may not have been foreseeable, the payment of at least some legal and lobbying fees was foreseeable. And because the government only challenges the payment of legal and lobbying fees in general, we have no occasion to determine whether specific portions of those fees might have been unforeseeable (and hence not recoverable).[9] Accordingly, we affirm the Claims Court's award of $3,385,783 for ENVY's legal and lobbying fees.

D

We hold, however, that ENVY has not established that the government could have foreseen the unprecedented requirement that ENVY contribute money into Vermont's Clean Energy Development Fund. The Clean Energy Development Fund was established in 2005 as part of the Dry Storage Act. *See* Vt. Stat. Ann. tit. 30, § 8015. The imposed fees bear no relationship to any costs incurred by the state or its citizens as a result of the construction of the dry storage facility. It would not be

---

[9] Thus we need not determine, for example, whether it was foreseeable that Vt. Stat. Ann. tit. 30, § 248(a)(2) would apply to the construction of a dry storage facility and would require ENVY to obtain a Certificate of Public Good from the Vermont Public Service Board.

inaccurate to characterize the fee as a form of blackmail for the state approval of the construction. ENVY conceded at oral argument that, at the time the Standard Contract was signed in 1983, neither Vermont nor any other state had imposed payments similar those into the Clean Energy Development Fund while licensing a nuclear utility. Moreover, ENVY conceded in another case that the Clean Energy Development Fund had "nothing to do with dry cask storage." J.A. 749.[10]

It was particularly unforeseeable that Vermont would require payments into the Clean Energy Development Fund because such a requirement raised a substantial question of preemption and was likely unconstitutional.[11]

---

[10] The only testimony at trial regarding the foreseeability of potential state-imposed costs was the testimony of an Entergy Services (a sister company of ENVY) employee who stated that there may be some "hidden costs and surprises regulatory-wise" if ENVY needed to transport SNF to other sites. J.A. 1059. Such testimony, referring generally to "hidden costs and surprises," and only applying to situations where ENVY would need to transport SNF generated at VYNPS off site, does not speak to the foreseeability of the costs actually imposed by the state.

[11] The State of Vermont alleges that the government waived its preemption argument by failing to timely notify the state of the preemption challenge pursuant to the notice requirements of 28 U.S.C. § 2403(b). Section 2403(b) applies to certain challenges to state statutes in a "court of the United States," which the Historical and Statutory Notes explain "is defined in section 451 of this title." *Id.* The definition of "court of the United States" in 28 U.S.C. § 451 includes Article III courts, but as we recognized in *Essex Electro Engineers, Inc. v. United States,* 757 F.2d 247, 251 n.1 (Fed. Cir. 1985), the Claims Court, as an Article I court, is not included within section 451's definition of "court of the United States." Accordingly, the notice provisions of section 2403 did not apply to this case in the Claims Court.

Through a trilogy of cases, the Supreme Court has established a test evaluating when a state law involving nuclear power is preempted by the United States government's authority over nuclear safety. *See English v. Gen. Elec. Co.*, 496 U.S. 72 (1990); *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983). "[T]he Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." *Pac. Gas*, 461 U.S. at 212. These limited powers include the states' "traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost and other related state concerns." *Id.* at 205. In *Pacific Gas*, the Court upheld California's moratorium only because the law was based on a non-safety (i.e., economic) rationale. *Id.* at 215-16. Under the Supreme Court's test, a state law related to nuclear power is preempted if it: (1) is motivated by safety concerns, *id.* at 213, or (2) "ha[s] some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels," *English*, 496 U.S. at 85.

Here, the required payments into the Clean Energy Development Fund totaled $15,625,000. This extraction of money is significant in amount, and, as a condition of constructing a dry storage facility, could easily deter a utility from constructing such a facility whose construction is encouraged if not mandated by federal law. *See* 42 U.S.C. § 10151(a).[12]   In *Skull Valley Band of Goshute*

---

[12]   42 U.S.C. § 10151(a) states: "(1) the persons owning and operating civilian nuclear power reactors have the primary responsibility for providing interim storage of spent nuclear fuel from such reactors, by maximizing, to the extent practical, the effective use of existing storage facilities at the site of each civilian nuclear power reactor,

*Indians v. Nielson*, 376 F.3d 1223, 1248-50 (10th Cir. 2004), the Tenth Circuit held that state provisions requiring payments to cover the "unfunded potential liability" of the site were preempted because "it is not the states but rather the NRC that is vested with the authority to decide under what conditions to license an SNF storage facility." Unlike the non-preempted state tort claims in *English* that only had "some effect" on radiological safety decisions, the requirement to pay money into the Clean Energy Development Fund could have a "direct and substantial effect" on decisions concerning radiological safety. *English*, 496 U.S. at 85. Such a regulation of "matters directly affecting the radiological safety of nuclear-plant construction and operation" is likely preempted, "'even if [it was] enacted out of nonsafety concerns.'" *Id.* at 84 (quoting *Pac. Gas*, 461 U.S. at 212). Notably, ENVY itself challenged the payments to the Clean Energy Development Fund on preemption grounds in a separate action before a federal district court (abandoning that challenge only after the Claims Court awarded those fees as damages), *see Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, No 1:11-cv-99, 2012 WL 162400 (D. Vt. Jan. 19, 2012), and even now does not argue that the Vermont law can escape preemption under federal law.

ENVY argues that "[d]isputing the state's authority to require the payments was not viewed as being in the best interests of the company" because "the company needed to continue to operate and do additional business in the

---

and by *adding new onsite storage capacity* in a timely manner where practical; [and] (2) the *Federal Government has the responsibility to encourage and expedite the effective use of existing storage facilities and the addition of needed new storage* capacity at the site of each civilian nuclear power reactor . . . ." (emphasis added).

state." ENVY Br. 52. Thus, they argue, their choice to acquiesce to the monetary demands of the state was reasonable. But whether or not ENVY's choice to acquiesce to the likely preempted state requirements was reasonable as a business proposition does not reflect on whether the costs incurred in complying with those requirements were foreseeable at the time the Standard Contract was signed. A leading treatise makes clear that reasonableness and foreseeability are separate requirements in the context of mitigation damages:

> If the attempt [to mitigate] is reasonable . . . the injured party can recover . . . [but] [t]his is subject . . . to the qualification applicable to the right to recover consequential damages of any kind, namely, that the defendant had reason to foresee them as a probable result of the defendant's breach when the contract was made.

*Williston on Contracts* § 64:29. Just because it may have been in ENVY's best interest to maintain good relations with the state and to agree to pay a fee that was likely preempted by federal law does not render the fee recoverable. ENVY's acquiescence to the state of Vermont went so far as to agree not to challenge the requirements of the Memorandum on preemption grounds. But ENVY cannot agree to improper state requirements, agree not to challenge those improper requirements on preemption grounds, and then pass the expense of complying with those requirements to the federal government. As we held in *Hercules Inc. v. United States*, a plaintiff cannot voluntarily forego defending itself against third-party claims that are barred as a matter of law, and then recover those costs from the government. 24 F.3d 188, 200 (Fed. Cir. 1994), *aff'd on other grounds*, 516 U.S. 417 (1996).

For these reasons, we reverse the Claims Court's award to ENVY of $5,625,000 in damages for payments made into the Clean Energy Development Fund.

E

It was similarly unforeseeable that Vermont would require the performance of a flood analysis, which also raises a substantial question of preemption. Here, the flood analysis was required due to the perceived inadequacies of a previously performed NRC-required flood analysis that "took into account a 'probable maximum flood' at the site to ensure that such flooding would not create *safety issues* at the plant." *Entergy Nuclear*, 95 Fed. Cl. at 179 (emphasis added). ENVY has failed to point to any evidence that, as of 1983, Vermont or any other state had required utilities to perform additional flood control analyses beyond those already performed under federal regulations. In any event, because the requirement to perform an additional analysis was directly motivated by safety concerns, it is clear that the flood analysis requirement was likely preempted under *Pacific Gas*, 461 U.S. at 215; *see also ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 471-72 (8th Cir. 1987) (finding state safety regulations to be preempted by the federal regulation of gas pipelines). The required flood analysis was thus not foreseeable. Accordingly, we reverse the Claims Court's award of $184,552 in damages for the performance of the river flood analysis.

F

ENVY has also failed to meet its burden of establishing that the requirement to build a visual barrier on two sides of the dry storage facility was foreseeable. Notably, the Public Service Board commented that "[VYNPS] is an industrial site, and from an aesthetic perspective, the addition of a limited number of concrete and metal con-

tainers results in little change to the overall aesthetics of the site." *Entergy Nuclear*, 95 Fed. Cl. at 178. The lack of an impact that dry storage would have on the overall aesthetics of a site suggests that the imposition of aesthetic requirements for a dry storage facility in particular was not foreseeable. Moreover, ENVY has failed to point to any evidence that, as of 1983, Vermont or any other state had imposed such aesthetic requirements as a prerequisite for licensing a utility. Accordingly, we reverse the Claims Court's award of $412,854 for the construction of the visual barrier.

### IV  Disposal of Contaminated Material and Characterization of Spent Fuel

The government challenges the Claims Court's award of $276,980 to ENVY for the costs of disposing contaminated soil and asphalt, and $156,000 for the costs of performing a characterization on SNF moved into on-site dry storage. We hold that the Claims Court clearly erred in awarding damages to ENVY for the costs of disposing contaminated material and for the costs of characterizing SNF moved into on-site dry storage.

In *Yankee Atomic Electric Co. v. United States*, we explained that "damages for breach of contract require a showing of causation," which in turn necessitates a "comparison between the breach and non-breach worlds." 536 F.3d 1268, 1273 (Fed. Cir. 2008). As we further explained in *Energy Northwest v. United States*, it is the plaintiff who "must prove the extent to which his incurred costs differ from the costs he would have incurred in the non-breach world." 641 F.3d 1300, 1306 (Fed. Cir. 2011). Thus, a plaintiff is entitled to recover costs "only to the extent it can prove, to a reasonable certainty, that but for the government's breach they would not have been incurred." *Id.* at 1307.

A

During the construction of the dry-storage facility at VYNPS, ENVY discovered contaminated soil and asphalt and incurred $276,980 in costs having that contaminated material disposed. The Claims Court did not find that DOE's breach caused the contamination, but rather found that DOE's breach caused ENVY to discover the contamination. The government challenges these costs on the grounds that they would have been incurred in a non-breach world when the site was eventually decommissioned. Without the benefit of our decision in *Energy Northwest*, the Claims Court held that "it [was] the Government, not ENVY, that [bore] the burden of demonstrating that these future costs at decommissioning would be identical." *Entergy Nuclear*, 95 Fed. Cl. at 191. However, *Energy Northwest* clearly dictates that it was ENVY's burden to "submit a hypothetical model establishing what its costs would have been in the absence of breach." 641 F.3d at 1305. Because ENVY failed to prove the amount by which its actual removal costs were different from what its removal costs would have been at decommissioning in a non-breach world, we reverse the Claims Court's award of $276,980 for the disposal of the contaminated material.

B

In preparing SNF for on-site dry storage, ENVY incurred $156,000 in costs to characterize the SNF. Such a characterization is required for storage in any NRC-approved cask. ENVY's theory is "that the fuel characterization may well be required a second time" for DOE-supplied casks, "when and if DOE performs." ENVY Br. 57. Thus, ENVY argues that it may have to pay for two characterizations, whereas in a non-breach world, it would have had to pay for only a single characterization

for the DOE-supplied casks. However, ENVY has not established the likelihood that DOE will require ENVY to incur further characterization costs upon performance. In fact, the Claims Court noted that "ENVY [itself] believes that DOE will accept" the previously performed characterization before finding that it is "possible that another review of the spent fuel condition will be required." *Entergy Nuclear*, 95 Fed. Cl. at 182. Further, ENVY has failed to "submit a hypothetical model" comparing what its costs would be in breach versus non-breach worlds in the event that DOE does eventually require further characterization. *Energy Nw.*, 641 F.3d at 1305. Accordingly, we reverse the Claims Court's award to ENVY of $156,000 in costs incurred for the spent fuel characterization.

## V  Issues Resolved By Our Recent Precedent

### A  Cost of Capital

ENVY challenges the Claims Court's denial of $7,472,866 in damages for the cost of capital to fund ENVY's mitigation activities. In *Energy Northwest*, we held that the no-interest rule barred parties to the Standard Contract from recovering the costs of financing mitigation projects. 641 F.3d at 1310-13 (citing 28 U.S.C. § 2516(a)); *see also Sys. Fuels, Inc. v. United States*, 666 F.3d 1306, 1310-11 (Fed. Cir. 2012). We further explained in *Boston Edison Co. v. United States* that the "commercial enterprise exception" to the no-interest rule did not apply in the context of the NWPA. 658 F.3d 1361, 1371 (Fed. Cir. 2011).

Consistent with our decisions in *Energy Northwest* and *Boston Edison*, we affirm the Claims Court's denial of ENVY's cost of capital claims.

## B  Overhead Costs

ENVY also challenges the Claims Court's denial of $788,414 in damages for its capital suspense loader overhead costs. Without the benefit of our recent SNF-related decisions, the Claims Court denied ENVY's capital suspense loader overhead claims despite acknowledging that "[ENVY]'s accounting practices follow Generally Accepted Accounting Principles [GAAP] and FERC Guidelines." *Entergy Nuclear*, 95 Fed. Cl. at 195. In *System Fuels*, where the "Plaintiffs used accounting procedures as mandated by FERC and consistent with [GAAP]," we held that the plaintiff's accounting records sufficiently "demonstrate[d] the effect of the mitigation project on the capital pools entitlement with reasonable particularity." 666 F.3d at 1312 (internal quotation marks omitted); *see also Energy Nw.*, 641 F.3d at 1309 (allowing recovery for the "portion of [the plaintiff's] overhead costs fairly allocated to support of the mitigation via generally accepted accounting practices"); *Bos. Edison*, 658 F.3d at 1370 (allowing recovery of "the portion of overhead costs (calculated using GAAP) that was attributable to mitigation projects").

Consistent with our recent decisions, we reverse the Claims Court's denial of $788,414 in damages for overhead costs allocated to ENVY's mitigation activities via the capital suspense loader.

However, we decline to review the Claims Court's holding with respect to the Resource Code 19 payroll loader based on ENVY's limited arguments on appeal. The Claims Court found that Resource Code 19 payroll loader included, among other items, pension costs for retired employees that could not be attributed to mitigation activity and were thus not recoverable. *Entergy Nuclear*, 95 Fed. Cl. at 195-96. On appeal, ENVY has

failed to develop an argument as to why Resource Code 19 payroll loader overhead costs should be considered analogous to other overhead costs that we have deemed to be sufficiently attributed to mitigation activities and thus recoverable.  Because ENVY has not adequately briefed its claim with respect to the Resource Code 19 payroll loader, we affirm the Claim's Court's denial of $10,013 in damages for that particular overhead cost.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED**

COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

—————————

**VERMONT YANKEE NUCLEAR POWER CORPORATION**
*Plaintiff-Cross Appellant,*

**v.**

**ENTERGY NUCLEAR VERMONT YANKEE, LLC, AND ENTERGY NUCLEAR OPERATIONS, INC.,**
*Plaintiffs-Cross Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

—————————

2011-5033, -5034, -5042

—————————

Appeals from the United States Court of Federal Claims in consolidated case nos. 02-CV-898 and 03-CV-2664, Judge Thomas C. Wheeler.

—————————

MAYER, *Circuit Judge*, dissenting-in-part.

I join the court's opinion, except for Part I-C, which concludes that the government waived the right to challenge the partial assignment by Vermont Yankee Nuclear Power Corporation ("Vermont Yankee") of its rights and obligations under the Department of Energy's Standard Contract. There was no waiver because the government

promptly and unequivocally objected to the partial assignment.

"'Waiver' is a vague term used for a great variety of purposes, good and bad, in the law. In any normal sense, however, it connotes some kind of voluntary knowing relinquishment of a right." *Green v. United States*, 355 U.S. 184, 191 (1957). The government never relinquished its right to challenge Vermont Yankee's partial assignment of its rights and obligations under the Standard Contract. It was not until 2006 that the government learned, during discovery, that Vermont Yankee breached the Standard Contract when it assigned its right to have the government accept spent nuclear fuel ("SNF"), but failed to assign the obligation to pay the substantial one-time fee for SNF generated prior to April 1983. Upon learning of the breach, the government promptly filed a motion for summary judgment in the Court of Federal Claims, arguing that the partial assignment violated the Assignment of Contracts Act, 41 U.S.C. § 15(a), and was therefore invalid. *See Vt. Yankee Nuclear Power Corp. v. United States*, 73 Fed. Cl. 236, 240 (Fed. Cl. 2006).

The fact that the government continued to accept payments under the Standard Contract after learning of the breach is insufficient to establish waiver. When a party timely and unambiguously objects to a breach, he does not forfeit his claim by continuing to accept payments under a contract. *See N. Helex Co. v. United States*, 455 F.2d 546, 555 (Ct. Cl. 1972) (explaining that a contractor's "acceptance of partial payment, even without notation on the check, does not waive his claim"); *Inland Trucking Corp. v. United States*, 150 Ct. Cl. 642, 654 (Ct. Cl. 1960) (emphasizing that a contractor did not waive his right to sue for breach by accepting "final payment" under a contract). In *Westfed Holdings, Inc. v. United States*, for example, we concluded that a bank had not waived its

right to seek damages notwithstanding the fact that it had continued to accept "hundreds of millions of dollars from the government" following the government's breach. 407 F.3d 1352, 1360 (Fed. Cir. 2005). We explained that because the government knew of the bank's "timely reservation of rights in protest to the breach," the continued acceptance of payments under the contract did not act as a waiver. *Id.*

A similar analysis applies here. Although the government continued to accept payments as required by the Standard Contract after learning of Vermont Yankee's breach, it preserved its right to challenge the partial assignment by filing a timely motion to have that assignment invalidated. *See All-Ways Logistics, Inc. v. USA Truck, Inc.*, 583 F.3d 511, 517 (8th Cir. 2009) (emphasizing that "there can be no waiver when the injured party does not manifest an intent to waive the breach"). "A party to a contract may waive the breach of an agreement by the continued acceptance of performance by the breaching party without reservation of rights." *Westfed*, 407 F.3d at 1360; *see also Ling-Temco-Vought, Inc. v. United States*, 475 F.2d 630, 637 (Ct. Cl. 1973) (applying the waiver doctrine where a contractor continued to perform under a contract and "no reservation of rights was made known"). Conversely, however, the waiver doctrine has no application where, as here, the non-breaching party promptly and vociferously protests a breach. *See Cole Taylor Bank v. Truck Ins. Exch.*, 51 F.3d 736, 740 (7th Cir. 1995) (explaining that while a victim of breach of contract must take some action to protect his contractual rights, he "is not required upon learning of the breach to wail and tear his hair").

*Tuftco Corp. v. United States*, 614 F.2d 740 (Ct. Cl. 1980), upon which the court relies, is inapposite. There, we concluded that the government waived its right to

object to contract assignments where the contracting officer had assured the contractor "that despite the Anti-Assignment Act, the assignments were proper and would be recognized by [the government]." *Id.* at 745. Here, by contrast, the government never approved of, or acquiesced in, the partial assignment, but instead immediately sought redress by seeking to have that assignment invalidated.

"Waiver is an affirmative defense, as to which the breaching party bears the burden of proof." *Westfed*, 407 F.3d at 1360. Mere assertions are not enough.

# United States Court of Appeals
# for the Federal Circuit

---

**VERMONT YANKEE NUCLEAR POWER CORPORATION,**
*Plaintiff-Cross Appellant,*

**v.**

**ENTERGY NUCLEAR VERMONT YANKEE, LLC, AND ENTERGY NUCLEAR OPERATIONS, INC.,**
*Plaintiffs-Cross Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2011-5033, -5034, -5042

---

Appeals from the United States Court of Federal Claims in consolidated Case Nos. 02-CV-898 and 03-CV-2663, Judge Thomas C. Wheeler.

---

BRYSON, *Circuit Judge*, concurring in part and dissenting in part.

I join the court's opinion on all issues but one: the majority's conclusion that payments to the Vermont Clean Energy Development Fund and the requirement to put up a visual barrier at the power plant were unforeseeable

and therefore cannot be included in the calculation of ENVY's damages.

With respect to ENVY's payments into the Clean Energy Development Fund, I would uphold the trial court's finding that it was reasonably foreseeable at the time of contract formation that a nuclear operator would be faced with expenses of that type if the government's breach forced the operator to build a dry storage facility. The costs of dealing with state regulatory efforts were clearly foreseeable. While the precise identity of those expenses may not have been predictable, all that is required is that "the injury actually suffered must be one of a kind that the defendant had reason to foresee." 11 Joseph M. Perillo, *Corbin on Contracts* § 56.7, at 108 (rev. ed. 2005); *see also Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1364 (Fed. Cir. 2010); *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007). The trial court reasonably found that the Clean Energy Development Fund payments met that test.

"Foreseeability is a question of fact reviewed for clear error." *Pac. Gas & Elec. Co. v. United States*, 668 F.3d 1346, 1352 (Fed. Cir. 2012), quoting *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001). The government has failed to show that the trial court's findings on the issue of foreseeability were clearly erroneous. The majority accepts the government's assertion that the payments in question were unforeseeable because the State's regulatory efforts would likely have been preempted by federal law. But that is far from clear. As the majority itself points out, states are permitted certain regulatory powers over nuclear energy facilities if those powers are directed at non-safety issues, such as economic or other concerns. The majority relies on *English v. General Electric Co.* for the proposition that

3

state law is preempted if it "ha[s] some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." 496 U.S. 72, 85 (1990). In fact, however, the Court in *English* concluded that even though claims for emotional distress stemming from whistleblowing activity relating to safety at a nuclear facility "may have some effect on these decisions," the effect was "neither direct nor substantial enough to place petitioner's claim in the pre-empted field." *Id.* Similarly, state tort law is not preempted for damages awards for radiation-based injuries—including punitive damages—even though the "prospect of compensatory and punitive damages for [these] injuries will undoubtedly affect nuclear employers' primary decisions about radiological safety in the construction and operation of nuclear power facilities." *Id.* at 86; *see Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984).

As the Supreme Court cases cited by the majority demonstrate, in 1983 it was foreseeable to the government that a state would try to regulate aspects of nuclear power facilities. In fact, the government was intimately involved in the litigation of nuclear power preemption cases, with varying degrees of success. *See English*, 496 U.S. 72 (1990) (United States as amicus); *Silkwood*, 464 U.S. 238 (1984) (same); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 211 (1983) (same). Attempted state regulation of nuclear waste storage facilities was at that time—and continued to be for years—a contested area of overlapping state and federal regulation.[1] *E.g., In re Indep. Spent Fuel Storage*

---

[1] The State of Vermont, as amicus curiae, asserts that the government cannot raise its preemption argument because it failed to give notice of that argument to

*Installation*, 501 N.W.2d 638, 648 (Minn. App. 1993) (concluding that "proposed facility must be classified as a radioactive waste management facility [and] must obtain legislative authorization" pursuant to state law); *cf. Citizens' Util. Bd. v. Pub. Serv. Comm'n*, 565 N.W.2d 554, 564 (Wis. App. 1997) (approving state commission's determination that environmental impact statement prepared for dry fuel storage was adequate).

Given such attempts to regulate nuclear power facilities by the states, it is reasonable to conclude that it was foreseeable that an injured party attempting to procure alternative storage for its SNF—and forced to do so quickly due to the government's breach—would acquiesce in state demands, even demands that might be regarded as excessive. "The reasonably foreseeable consequences of a breach of contract are compensable, whether they were actually foreseen or not, or even if the criminal act of a third person intervened." 24 Richard A. Lord, *Williston on Contracts* § 64:13, at 138-39 (4th ed. 2002). Because the issue of foreseeability in this case is at least debatable, we should defer to the trial court's findings.

Given the pressure—due to the government's breach—on ENVY to build SNF storage facilities quickly, it was also foreseeable that ENVY would elect not to engage in prolonged, costly, and complex litigation with

the State pursuant to 28 U.S.C. § 2403(b). Setting aside whether section 2403 applies to the Court of Federal Claims, the statute is directed to the court, not the government. Moreover, the preemption issue is not directly presented by this case; it is raised only indirectly, in support of the government's contention that in light of the preemption doctrine among other reasons, it would not have been foreseeable for a nuclear operator to have to make mitigation payments in response to state regulatory efforts.

5

the State of Vermont over the preemption issue. *See* Restatement (Second) of Contracts § 351, cmt. c, illus. 9 (explaining that payment of settlement by injured party to avoid litigation with a third party is foreseeable and therefore recoverable); *cf. N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 122 (2d Cir. 2010) (concluding that in light of exceptional circumstances, it was reasonable for the insured to act quickly to minimize damages, even if its actions were not in strict compliance with those recommended by the insurer).

In an analogous case, the Court of Federal Claims rejected a similar argument by the government, stating that it "simply cannot be the case that plaintiff should be required to mitigate the damages caused by defendant's breach . . . , be compelled to pursue that mitigation through the state legislature . . . , and then in the final analysis be forced to absorb the economic cost of legislative mandates it had no power to avoid." *N. States Power Co. v. United States*, 78 Fed. Cl. 449, 463, 464 (2007); *see also Valladares v. DMJ, Inc.*, 885 P.2d 580, 582 (Nev. 1994) ("[I]t would be inequitable for [the injured party] to be forced to pay for the results of [the breaching party's] extreme lack of diligence in completing the contract."). In this setting, as in other similar instances involving the question of which party should bear the costs of mitigation, "the risks incident to [efforts to minimize losses from a breach] should be carried by the party whose wrongful conduct makes them necessary." 11 Joseph M. Perillo, *Corbin on Contracts* § 57.16, at 349.

The same arguments apply with perhaps even greater force to the costs for constructing the visual barrier. The government's preemption rationale is attenuated in that setting because it is beyond dispute that states are permitted to regulate certain environmental aspects of

nuclear power plants as long as those aspects are unrelated to radiological safety. *Silkwood*, 464 U.S. at 249; *N. States Power Co. v. Minnesota*, 447 F.2d 1143, 1151 (8th Cir. 1971) (explaining that Atomic Energy Act "does not impair State authority to regulate activities of [nuclear plant operators] for the manifold health, safety, and economic purposes other than radiation protection"); *Pennsylvania v. Lockheed Martin Corp.*, 684 F. Supp. 2d 564, 588 (M.D. Pa. 2010) (state statute permitting recovery of cleanup costs for radioactive material does not "cause a direct or substantial effect on the decisions made by [operators of] nuclear facilities concerning radiological safety levels"); *Me. Yankee Atomic Power Co. v. Bonsey*, 107 F. Supp. 2d 47, 54 (D. Me. 2000) ("Nonradiological aspects of spent fuel storage, however, are still subject to some regulation by the states . . . ."); *Conn. Coal. Against Millstone v. Conn. Siting Council*, 942 A.2d 345, 359 (Conn. 2008) (state council's findings with respect to factors such as "distance of [nuclear] facility from residential areas, the flood zone, and tidal and inland wetlands; the impact of the facility on groundwater; [and] the design of the facility" are not preempted by federal law).

Because a visual barrier cannot be said to relate to radiological safety concerns, it likely lies outside the zone of federal preemption. It is therefore foreseeable that a state would respond to a proposed dry storage facility by requiring the construction of a visual barrier for aesthetic reasons and that such a requirement would not be subject to challenge on preemption grounds. *See Me. Yankee*, 107 F. Supp. 2d at 55 (state may insist that nuclear operator "comply with state requirements that do not impermissibly infringe on radiological, operational, construction, or safety issues, such as, for example, aesthetic landscaping requirements").

I therefore respectfully dissent from the majority's decision to reverse the trial court on those two disputed items of mitigation expenses.