NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**PLASTRONICS SOCKET PARTNERS, LTD.,
PLASTRONICS H-PIN, LTD.,**
*Plaintiffs-Appellants*

**v.**

**DONG WEON HWANG,**
*Defendant-Cross-Appellant*

**HICON CO., LTD., HICON COMPANY,**
*Defendants-Appellees*

---

2020-1739, 2020-1781

---

Appeals from the United States District Court for the Eastern District of Texas in No. 2:18-cv-00014-JRG-RSP, Chief Judge J. Rodney Gilstrap.

---

Decided: January 12, 2022

---

P. MICHAEL JUNG, Clark Hill Strasburger, Dallas, TX, argued for plaintiffs-appellants.

STEPHANIE SIVINSKI, Haynes & Boone, LLP, Dallas, TX, argued for defendant-cross-appellant and defendant-

appellee.  Also represented by JOHN RUSSELL EMERSON, DEBRA JANECE MCCOMAS; ANGELA OLIVER, Washington, DC.

_____

Before DYK, HUGHES, and STOLL, *Circuit Judges.*

DYK, *Circuit Judge.*

Plastronics Socket Partners, Ltd. ("Plastronics Socket") and Plastronics H-Pin, Ltd. (collectively, "Plaintiffs") brought suit against Dong Weon Hwang, HiCon Co., Ltd. ("HiCon"), and HiCon Company (collectively, "Hwang"), alleging patent infringement, various torts, and breach of contract.  Hwang brought counterclaims for patent infringement and breach of contract.  Following a jury trial, the district court awarded damages to both Hwang and Plaintiffs under the breach of contract claims.  We *affirm* the judgment in favor of Hwang and *reverse* the judgment in favor of Plaintiffs.

## BACKGROUND

Spring pins are used with sockets to receive and test semiconductor chips.  Hwang developed a type of spring pin referred to as the H-Pin around 2004 while living and working in Korea.  Prior to the H-Pin, the most common form of spring pin was manufactured using machined parts.  The H-Pin was designed to be manufactured by stamping instead of machining.  Stamping parts provides benefits of speed and cost over machining parts.

After moving from Korea to Texas, Hwang began working for Plastronics Socket in October 2004.  Hwang filed an application for a Korean patent on the H-Pin invention around the time he started at Plastronics Socket.

In 2005, Hwang and Plastronics Socket executed a Royalty Agreement.  Under the Royalty Agreement, Plastronics Socket would pay for commercial development of the H-Pin, the costs associated with patent applications

worldwide, and a 3% royalty on sales of H-Pins and sockets containing H-Pins "after all non-reoccurring capital costs." J.A. 12,426. Hwang, for his part, granted Plastronics Socket the joint right to practice the technology covered by the H-Pin patents worldwide except in Korea and agreed to share royalties he was paid from third parties (paragraph 4). Specifically, paragraph 4 of the Royalty Agreement states:

> **Remuneration to [Plastronics Socket]**: As a assignee of the patent or patents pertaining to the H-pin project, Hwang has certain rights to use this patent or license the patent with consent of the other assignee, [Plastronics Socket]. In the event the patent royalties are paid by a third party, [Plastronics Socket] and Hwang will split royalty 50%/50% respectively. In the event when Hwang works directly for another entity, [Plastronics Socket] will be entitled to 1.5% of royalty([Plastronics Socket] and Hwang will split royalty 50%/50% respectively ) of gross sales of patented products from the "H-Pin Project" from this entity. If socket is sold with H-pin contact included, this rate is also 3/2% of socket price.

J.A. 12,426.[1] Both parties were prohibited from granting licenses on the H-Pin without the other party's approval (paragraph 5). Specifically, paragraph 5 of the Royalty Agreement states:

> **Licensing the "H-Pin Project" patent rights**: Neither [Plastronics Socket] or Hwang can grant a license for the patents covering the "H-Pin Project" without approval from the other party.

---

[1]    Spelling and other errors in original have not been corrected.

J.A. 12,427.

In 2008, Hwang left Plastronics Socket, founded HiCon in Korea, and licensed his Korean patent to HiCon—allegedly without the required consent from Plastronics Socket.

The H-Pin was evidently a successful innovation, leading the CEO of Plastronics Socket, David Pfaff, to tell Hwang in 2011, "All the spring pin companies are coming out with stamped spring probes. You have changed the world." J.A. 13,037. Through the close of discovery at the district court, Plastronics Socket had sold over $65 million worth of sockets with H-Pins, accounting for more than half of its revenue, and did not pay Hwang royalties allegedly in violation of the agreement.

In 2012, Plastronics Socket created Plastronics H-Pin through a divisive merger under Texas law and assigned all rights and obligations under the Royalty Agreement to Plastronics H-Pin. Plaintiffs argue that the divisive merger barred liability for damages for socket sales.

Before trial, the district court granted summary judgment to Hwang of no liability under paragraph 4 of the Royalty Agreement. At trial, Plaintiffs presented claims for breach of only paragraph 5. The district court instructed the jury that it could award damages to Hwang under the Royalty Agreement for royalty payments "called for and due after January the 19th, 2014," four years before the date the suit was filed (because of the four-year statute of limitations in Texas). J.A. 9944.

After trial, the jury found both parties had breached the Royalty Agreement and awarded Plaintiffs $622,606 for Hwang's breach and awarded Hwang $1,361,860 for Plaintiffs' breach. Plaintiffs appeal the denial of attorneys' fees and the damages awarded to Hwang. Hwang cross-appeals the damages awarded to Plaintiffs. We have jurisdiction under 28 U.S.C. §§ 1291, 1295(a).

## DISCUSSION

Although the Royalty Agreement does not contain a choice-of-law provision, the contracts have been executed in Texas and both parties agree that Texas law applies. We therefore apply Texas law to these issues. *Univ. of W. Va. Bd. of Trustees v. VanVoorhies*, 278 F.3d 1288, 1296 (Fed. Cir. 2002). We review the district court's contract interpretation de novo. *Merritt Hawkins & Assocs., LLC v. Gresham*, 861 F.3d 143, 154 (5th Cir. 2017). We also review the district court's application of the statute of limitations de novo. *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000).

### I

Plaintiffs argue that the district court erred by upholding a damages award that included socket sales by Plastronics Socket. Plaintiffs argue only Plastronics H-Pin was liable under the Royalty Agreement, and the district court thus erred by allowing damages to include sales of sockets with H-Pins because Plastronics Socket had no obligation under the Royalty Agreement. The question before us is whether the Texas divisive merger statute permits Plaintiffs to avoid liability for sales of sockets with H-Pins under the Royalty Agreement by assigning the liability for royalty payments to a new subsidiary that does not sell such sockets while Plastronics Socket continues to sell the sockets. We hold it does not and affirm the district court's judgment.

### A

The equipment involved in this case has two major components: (1) H-Pins and (2) sockets that receive chips for testing and include H-Pins, within the sockets, to connect to chips for testing. The Royalty Agreement required payment of royalties for the sale of H-Pins separately and also for the sale of H-Pins with sockets.

In 2012, Plaintiffs entered into a divisive merger under Texas law allocating sole responsibility for license payments under the Royalty Agreement to a newly created

sister company, Plastronics H-Pin, which produced the H-Pins and sold them to Plastronics Socket as its sole customer. Plastronics H-Pin itself made no socket sales and received no payments on socket sales. Because all the liabilities under the Royalty Agreement were allocated to Plastronics H-Pin, Plastronics Socket argues it was not liable for selling sockets with H-Pins. At least in part, the merger appears related to avoiding licensing payments. The objective was to "Spin off all the H-pin business into an entity and sell at cost to Plastronics as a master distributor, therefore never worrying about royalties [to Hwang]." J.A. 12,831.

B

Under general contract law principles, the assignment of rights through mergers cannot adversely affect the rights of parties contracting with the entities undergoing the mergers, i.e., obligors. The Restatement (Second) of Contracts states:

> (2) A contractual right can be assigned unless (a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him . . . .

Restatement (Second) of Contracts § 317(2) (1981); *see Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC*, 683 F.3d 1330, 1340 (Fed. Cir. 2012) ("[U]nder standard contract law, assignments are generally not permitted in situations where they would disadvantage the obligor."). We must decide whether the Texas merger statute was designed to contradict this contract law principle.

Under the Texas statute, a "domestic entity may effect a merger." Tex. Bus. Orgs. Code Ann. § 10.001 (West 2015). The statute requires:

> "If more than one organization is to survive or to be created by the plan of merger, the plan of merger must include . . . (3) the manner and basis of allocating each liability and obligation of each organization that is a party to the merger . . . among one or more of the surviving or new organizations."

*Id*. § 10.003. "When a merger takes effect . . . (3) all liabilities and obligations of each organization that is a party to the merger are allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger." *Id*. § 10.008(a). Thus, Texas law plainly provides for the allocation of liabilities and obligations under its merger statute.

But the Texas statute also ensures that, in accordance with the common law, such agreements cannot disadvantage the obligee. The statute states, "This code does not . . . abridge any right or rights of any creditor under existing laws." *Id*. § 10.901. This language indicates that a purpose of the statute was to enable mergers that did not adversely affect the rights of parties under preexisting contracts with the entities undergoing the mergers. The legislative history confirms the intent that a

> [c]reditor's rights would not be adversely affected by the proposed amendment, and creditors would continue to have the protections provided by the Uniform Fraudulent Transfer Act and other existing statutes that protect the rights of creditors.

H. Comm. on Bus. & Com., Bill Analysis, H.B. 472, 71st Reg. Sess., at 23 (Tex. 1989). And one of the authors of the Texas merger statute reflected:

> While the provisions permitting multiple surviving entities in a merger were intended to provide

corporations with greater flexibility in structuring acquisition and restructuring transactions, they were not intended to have any material effect on the existing rights of creditors of the parties to a merger.

Curtis W. Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 St. Mary's L.J. 109, 122 (1989).

Two recent bankruptcy court cases also confirm this interpretation that the Texas divisive merger statute did not relieve companies of obligations under preexisting agreements. *In re Aldrich Pump LLC*, No. 20-30608 (JCW), 2021 WL 3729335, at *27–30 (Bankr. W.D.N.C. Aug. 23, 2021); *In re DBMP LLC*, No. 20-30080 (JCW), 2021 WL 3552350, at *24–26 (Bankr. W.D.N.C. Aug. 11, 2021).

Thus, the language of the statute, confirmed by its legislative history and consistent with the principles of contract law for assignment of rights, compels our conclusion that the Texas divisive merger statute does not enable an entity to eliminate royalty payments due under a contract with the predecessor entity. Plastronics Socket cannot divest itself of the obligation to pay royalties on sockets sold with H-Pins.

Under the Royalty Agreement, Plastronics Socket is liable for the royalty payments. The parties contemplated sales of sockets with H-Pins and addressed those sales specifically in the contract. The Royalty Agreement states, "In light of the patent being invented before employment began with [Plastronics Socket], Hwang will be entitled to the 3% of gross sales policy for the life of the patent. If socket is sold with H-pin contact included, this rate is also 3% of socket price." J.A. 12,426. And it states, "This agreement will continue in force to Hwang's estate or designated party upon death or transfer." J.A. 12,427. Eliminating socket sales (with H-Pins) from the royalties due to Hwang, as Plaintiffs have attempted to do here, unmistakably and materially reduces the value owed to Hwang, which runs

counter to the language in the Royalty Agreement and the express intent of the Texas divisive merger statute. In light of our construction of the Texas merger statute and the clear language in the Royalty Agreement, Plaintiffs are liable for payment of royalties for sales of both H-Pins and sockets with H-Pins by either Plastronics Socket or Plastronics H-Pin.

We affirm the district court's award of damages to Hwang.

## II

With respect to Plaintiffs' claim against Hwang, the district court found that the claim was not barred by the Texas four-year statute of limitations. Hwang argues that this holding was erroneous.

Breach-of-contract cases are subject to a four-year statute of limitations under Texas law, measured from the date the claim accrues. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002); Tex. Civ. Prac. & Rem. Code § 16.051. "It is well-settled law that a breach of contract claim accrues when the contract is breached," *Stine*, 80 S.W.3d at 592, which occurs upon failure to perform a contractual duty, *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 765 (Tex. 2014). The "cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003).

Here, Plaintiffs initially claimed that Hwang was liable for breach of both paragraphs 4 and 5 of the Royalty Agreement. As explained earlier, paragraph 4 of the Royalty Agreement requires Hwang to split royalty payments with Plaintiffs. On summary judgment, the court held that "Plaintiffs are not entitled to a royalty payment under" paragraph 4, J.A. 8286, because Plaintiffs had not presented any evidence that any royalty payment was ever received by Hwang from a third-party. As the court later stated, it

granted "summary judgment as to any theory of breach of the Royalty Agreement as to Section 4," which required "Mr. Hwang to split any royalties paid to him with Plastronics." J.A. 11–12. Plaintiffs do not challenge the court's summary judgment ruling on appeal.

Plaintiffs at trial only sought to recover for breach of paragraph 5 in the Royalty Agreement. Paragraph 5 prohibits the parties from licensing the "H-Pin Project" without approval from the other party. J.A. 12,427. Hwang does not dispute that he breached the licensing requirement in paragraph 5—he executed a license to HiCon on October 29, 2008. Hwang argues instead that this breach of paragraph 5 indisputably occurred almost ten years prior to filing of this lawsuit, which is well outside the four-year statute of limitations, and that the breach did not involve failure to make periodic payments.

Hwang is correct: the breach of contract found by the jury arose from a single, unauthorized license grant. Hwang breached the agreement by licensing the patent to HiCon almost ten years before Plaintiffs filed suit. This case thus does not involve a claim for failure to make periodic payments similar to the situation in *Hooks v. Samson Lone Star, LP*, where the statute of limitations applied separately to each missed payment. 457 S.W.3d 52, 68 (Tex. 2015). The fact that the royalty payments described in paragraph 4 could inform the damages for a breach of paragraph 5 due to unauthorized licensing does not affect the date on which the claim arose. The facts giving rise to the breach came into existence when Hwang granted the unauthorized license to HiCon—the breach accrued at that time and the statute of limitations began to run. *See Knott*, 128 S.W.3d at 221. The four-year statute of limitations bars the claim.

## CONCLUSION

We reverse the damages awarded to Plaintiffs. Plaintiffs are not the prevailing party, and we do not reach the

attorneys' fees issue.  We affirm the damages awarded to Hwang for the sales of H-Pins and sockets with H-Pins, including the sales by Plastronics Socket.

### AFFIRMED IN-PART, REVERSED IN-PART

COSTS

Costs to Hwang.